Robert L. BELCHER

v.

UNITED STATES of America.

Civ. A. No. 77–4361.

United States District Court,
E. D. Pennsylvania.

March 31, 1981.

David Rudovsky, Kairys, Rudovsky & Maguigan, Philadelphia, Pa., for plaintiff.

Peter Vaira, U.S. Atty., Alexander Ewing, Jr., Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GILES, District Judge.

This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, for damages resulting from bodily injuries sustained when plaintiff was shot by a Secret Service agent of the United States. The plaintiff demands recovery from the United States, as sole defendant, for false arrest, false imprisonment, assault and battery, malicious prosecution, negligence, and the unjustified use of deadly force.

A bench trial was held in this matter. After reviewing the testimony of witnesses and the briefs of counsel, the court finds in favor of the government and against plaintiff for the reasons which follow and constitute the findings of fact and conclusions of law required by Fed.R.Civ.Pro. 52(a).

## I. FINDINGS OF FACT

1. United States Secret Service agents Evan T. Jenkins and Peter Dowling of the Check Forgery Squad went to plaintiff's Philadelphia premises during the afternoon of April 7, 1977, to request that plaintiff come to their downtown offices for questioning relative to a forged treasury check. They properly identified themselves as federal agents and entered the first floor of the premises where plaintiff had a hair salon. Plaintiff lived in an upstairs apartment. Initially, he voluntarily agreed to accompany the officers but wanted to get a jacket which was in an upstairs closet. The two officers went with plaintiff upstairs,

where they encountered several of his friends.

2. Once upstairs, plaintiff began to question the agents' credentials and identification as well as the necessity to conduct the interview downtown. He offered to be interviewed in his apartment.

3. The agents insisted that they would prefer to question him outside his home. There was no warrant for plaintiff's arrest and at that point the agents had no cause for his arrest.

4. Agent Jenkins touched plaintiff's elbow lightly in an effort to encourage plaintiff to start toward the stairs leading down to the first level. Plaintiff forcibly and suddenly pushed away from him, initiating the struggle which ensued. Jenkins then tried to restrain the plaintiff and told plaintiff he was under arrest. Plaintiff again resisted and Jenkins attempted to handcuff him. Jenkins succeeded in handcuffing only plaintiff's left wrist.

5. The struggle caused both men to fall onto a nearby sofa. Jenkins was lying under the plaintiff.

6. Dowling tried to assist Jenkins in bringing plaintiff under control by handcuffing his arms behind his back, but Dowling was unsuccessful, finding that plaintiff was unusually strong. Dowling stopped his efforts to subdue plaintiff because he thought plaintiff's friends might aid plaintiff by joining the struggle. Dowling pulled his revolver, training it on plaintiff's friends to keep them out of the melee.

7. The struggle continued between plaintiff and Jenkins. Plaintiff yelled to his friends to get help. They then ran down the stairs. Dowling did not chase them but turned to aid Jenkins.

8. Using his right arm, plaintiff had Jenkins in a headlock. His left hand and arm were to the interior side of the sofa near Jenkins' waist. Dowling attempted to get plaintiff's arms behind his back again. He was again unsuccessful because of plaintiff's uncommon strength. He then tried to strike plaintiff twice with his revolver, a .357 Magnum, but somehow (Dowling believes with his right arm) plaintiff fended off each blow.

9. At this point, Dowling heard Jenkins say, "My gun, my gun," and could see part of plaintiff's arm inside Jenkins' pants at the waist where Dowling knew Jenkins carried his gun in an inside holster.

10. Seeing that, and believing plaintiff was in possession of or reaching for Jenkins' gun, Dowling, although not seeing the gun or plaintiff's hand on the gun, stepped back and fired his revolver twice at plaintiff's head, intending to kill him because he reasonably thought Jenkins was in imminent mortal danger and that time did not permit hesitation or any less drastic action.

11. One shot missed; one shot hit the plaintiff in the right forearm and lodged near the right armpit. Dowling saw plaintiff go limp, and believed he was dead. Plaintiff, however, had been shot not in the head but in the right armpit, and continued struggling. Still, Jenkins and Dowling were unable to control plaintiff.

12. Dowling believed plaintiff's friends had gone to bring others back to fight the officers. Dowling tried to phone for back-up assistance, but the telephone in the apartment was dead. He then went outside to his car to call for assistance.

13. It is undisputed that plaintiff had considerable strength after the shooting. Plaintiff, who testified he believed by then that he was going to be assassinated, was able to knock out a window on the second floor to gain attention of passers-by, and grab from the wall a ring of knives with which he attacked Jenkins, cutting Jenkins' face and back. Jenkins attempted to flee, but fell down the stairs. Plaintiff was able to jump down the stairs after Jenkins and was swinging the knives at him in a deadly manner as he lay at the bottom when the Philadelphia police arrived on the scene.

14. An unidentified city plainclothesman struck plaintiff in the mouth with a nightstick, knocking out four of his upper front teeth. Plaintiff seeks damages from the United States as a result of this injury also.

15. The bullet went through plaintiff's right forearm and entered his upper body through the armpit. It has not been removed and causes plaintiff discomfort.

## II. DISCUSSION

### A. *Facts*

■ Most material factual issues in this case are hotly disputed. Because the resolution of these issues depends largely on credibility, I shall explain why I have accepted one version of the events and rejected another.

The plaintiff testified that after his coat was thrown to him by Dowling, who used racial epithets, plaintiff walked after Jenkins who was headed toward the other side of the room. Plaintiff said he was inquiring why he could not be questioned at his apartment instead of downtown. Jenkins suddenly sat down on the sofa, pulled plaintiff down towards him, and attempted to handcuff him. Jenkins was able to handcuff only plaintiff's left wrist. Being surprised, plaintiff struggled to his feet while Jenkins held on to the handcuffs. Plaintiff was pulled down again. He was able to get to his feet again after pushing off Jenkins. Plaintiff claims that the handcuff on his left wrist was being held by Jenkins and that his arms were extended up beside his head and bent at the elbow. At this point, he heard Jenkins yell to Dowling, words to the effect, "He's got my gun." Dowling, who was holding plaintiff's friends at gunpoint, immediately turned and fired his revolver. Plaintiff demonstrated that the bullet went through his right forearm, entered his right armpit, and lodged in his upper body.

Upon the firing of the gun, plaintiff's friends ran down the stairs. Plaintiff testified that having been shot without provoca-tion, he believed the agents intended to kill him without cause. Therefore, he struggled in self-defense against Jenkins whom he believed to be armed with a gun. He knocked out the window to attract attention and grabbed a ring of oriental knives from the wall. He claims that these and subsequent actions were all in self-defense.

The evidence presented during the trial centered on only one factual issue for determination in this case: whether at the time Agent Dowling used deadly force, firing his revolver intending to kill plaintiff, he had a reasonable belief that either he or Jenkins was in imminent peril of death or serious bodily harm.[1] On these facts, whether deadly force was justified at the time it was used becomes a credibility determination.

Only the plaintiff and the two agents testified; none of plaintiff's friends who were eyewitnesses were called to the stand. There are only two facts on which all three witnesses were consistent. First, immediately before the shooting, Jenkins yelled either, "My gun, my gun," or "He's got my gun," and only then were the shots fired. Second, neither Jenkins nor Dowling observed plaintiff's hand on Jenkins' gun at any point during the episode, even after plaintiff was shot.

Plaintiff would have the court believe that at the time he was shot, he was standing erect, with arms and hands in the air, nowhere near Jenkins. Therefore, he contends that Dowling fired the shot clearly seeing that Jenkins was not in peril of serious bodily injury. Plaintiff says his hands were empty.

Jenkins would have the court believe that while plaintiff was astride him on the sofa, he felt the release of the pressure of his gun against his body, and assumed plaintiff was removing it when he felt plaintiff's left

---

1. Two brief points earlier in the altercation are also significant. Having listened to all of the testimony and closely observed the demeanor of the witnesses, the court has found (1) that Jenkins touched plaintiff's elbow lightly, almost off-handedly, to encourage plaintiff to accompany the agents, and (2) that Jenkins attempted to handcuff the plaintiff only after plaintiff suddenly, aggressively, and forcefully pushed Jen-kins away from him, converting the discussion into a violent encounter. The court does not find credible plaintiff's testimony that, without cause and before plaintiff forcibly resisted the agents, Jenkins suddenly sat down on the sofa, pulled plaintiff (who was standing) down towards him, and attempted to handcuff the plaintiff, all without informing plaintiff that he was under arrest.

hand down in his trouser waistband where his gun was inside a holster. He claimed that he then grabbed plaintiff's left arm with both his hands while yelling that plaintiff had his gun.

Dowling claims that he also saw plaintiff in control over Jenkins and saw plaintiff's arm inside Jenkins' trousers where he knew Jenkins' gun to have been. He testified that he tried to handcuff and subdue plaintiff, and tried to strike him unconscious using his gun as a club, but to no avail. When he heard Jenkins yell that plaintiff had his gun and when he saw plaintiff's left arm down where the gun would be, he fired, believing that there was neither time to delay nor an alternative other than deadly force. Due to his partner's proximity to plaintiff and Jenkins' position immediately under plaintiff, Dowling believed that shooting plaintiff other than in the head would further endanger his partner's life.

Having observed the marks left by the bullet on plaintiff's right forearm, it appears to the court that the path of the bullet, assumed to be a straight line, is inconsistent with plaintiff's testimony as to his position at the time of the shooting. There was no testimony that the bullet was or could have been deflected. If plaintiff had been standing with his arms and hands raised, the bullet necessarily would have been on a downward path in order to enter the forearm and the armpit area. It does not appear possible that there could have been such a downward trajectory if, as plaintiff asserts, he was standing, Dowling was standing, and Dowling was on the other side of the room. The court observed Dowling to be about the same height as plaintiff.

On the other hand, the trajectory of the bullet through plaintiff's forearm and into his right armpit is consistent with Dowling's testimony that he was above plaintiff when he stepped back and shot. Finding the trajectory of the bullet, in that respect, consistent with Dowling's testimony, the court also credits his testimony that plaintiff was atop Jenkins at the time of the shooting and not standing upright as plaintiff testified.[2]

Although it strains credulity that two sizable Secret Service agents could not have completely subdued an individual of lesser physical stature such as plaintiff by less than deadly force long before the altercation degenerated, the court must concede that at the point when Jenkins yelled that plaintiff had his gun, Dowling could have reasonably believed that plaintiff did have the gun, and that serious bodily harm to Jenkins or himself was imminent. While the court has tried to dissect the scene in slow motion, it nevertheless appreciates that the events occurred rapidly and that Dowling had to make a split-second decision to fire or not to fire. In retrospect he may have been in error in his belief that plaintiff had the gun. However, based upon all of Dowling's sensory information and perceptions at the moment, his actions were reasonable. I have found that plaintiff was atop Jenkins, attacking him, that plaintiff was extremely strong and difficult to subdue, that plaintiff had his left arm in a position next to Jenkins' body where he could indeed possess the gun and that Jenkins caused Dowling to believe that plaintiff did have the gun.

Although Dowling's testimony was impeached on cross-examination through testimony given at plaintiff's criminal trial in that he had not left plaintiff for dead but had attempted to continue to subdue him after the shooting, the court found his testimony credible overall. Dowling's recollection is vivid and strong on the most important point. He intended to kill plaintiff by shooting him in the head from very close

---

2. To impeach plaintiff's credibility, the government offered, and plaintiff stipulated to, the admissibility of evidence of several *crimen falsi* felony convictions of plaintiff. The government then offered evidence of certain misdemeanor convictions not involving *crimen falsi*. Because this court does not find the proffered evidence of the misdemeanor convictions probative to credibility, the government's motion for admission of the non-felony convictions is denied, *see* Fed.R.Evid. 609(a), and is without effect on the court's evaluation of the plaintiff's testimony and demeanor while on the witness stand.

range, but missed. I do not find that testimony contrived or incredible. That Dowling, a trained agent, missed shooting plaintiff in the head is consistent both with the perceived urgency of the moment and poor marksmanship.

Having credited testimony that plaintiff was atop Jenkins, the court must yet ask whether Jenkins contrived the entire situation to prompt the shooting of plaintiff. The record is devoid of motive or inclination on Jenkins' part to use unreasonable force or to harm plaintiff. Furthermore, it is implausible that anyone would intentionally invite the shooting of someone lying on top of him because the bullet from a .357 Magnum pistol could hit and kill him. If Jenkins knew anything at all about Dowling's marksmanship, or lack of it, he certainly would not knowingly have risked being in or near his line of fire. The court can only conclude that Jenkins did feel his revolver slip out of his holster and reasonably believed that plaintiff, because of his arm position, either had or would immediately have full control of the revolver.

The testimony concerning plaintiff's extraordinary strength is corroborated by plaintiff himself, specifically his physical abilities which were demonstrated after being shot by a bullet from a .357 Magnum revolver. Despite the wounds to his right forearm and upper body, he overcame the physical efforts of Jenkins, knocked out a window pane with his elbow, obtained and used a sheath of knives against Jenkins, backed Jenkins across the room and to the top of the stairs, caused Jenkins to fall down the stairs and leaped down the stairs after him. Plaintiff's physical capacity throughout the struggle was far greater than had been anticipated by the agents. If as plaintiff contends, the agents were intent upon assassinating him, there was opportunity for Dowling, at least, to do so after plaintiff had been wounded.

In conclusion, having observed the demeanor of the two government witnesses and plaintiff and having listened to and analyzed their testimony, the court credits the testimony of the agents as to that critical moment of time in which the shooting occurred. At that time, the court finds Dowling and Jenkins had reason to believe that due to plaintiff's actions Jenkins was in danger of serious bodily harm, and the use of deadly force was justified.

## B. *Law*

■ Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the substantive law of Pennsylvania, the state in which the acts occurred, determines whether the United States is liable to the plaintiff.[3] Agents Jenkins and Dowling were acting within the scope of their employment at all pertinent times.[4]

Thus, the sole legal issue in this case is whether the agents committed a tort under Pennsylvania law. This issue is best analyzed by asking, at any given moment, whether the agents were privileged to commit what would otherwise be a tort, and, if unprivileged, whether they committed a tort. Because both counsel have diverted the court's attention by imprecise characterization of the legal questions, it would be useful to undertake this analysis only after delineating what is *not* at issue in this case.

---

**3.** 28 U.S.C. § 1346(b) provides:

> Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**4.** Plaintiff seeks damages from the United States for the actions of an unidentified Philadelphia plainclothesman who knocked out plaintiff's front teeth. There is no evidence that the city officer was an employee of the United States. Further, the evidence cannot support a finding that plaintiff's tooth injuries were proximately caused by the actions of any United States employee.

### 1. Non-Issues

This is a civil action for an alleged civil wrong. Neither plaintiff nor the agents are now on trial for crimes. Thus, it is not an issue whether the agents violated the Pennsylvania Crimes Code. *Cf.* Plaintiff's Proposed Conclusions of Law, ¶ 4 (asking that I conclude that the agents are guilty of the crime of assault, 18 Pa.Cons.Stat.Ann. § 2701(a) & (b) (Purdon 1973)). *See also, e. g., Commonwealth v. Trowbridge*, 261 Pa. Super. 109, 114 n.6, 395 A.2d 1337, 1339 n.6 (1978) (en banc) (contrasting crime of assault with tort of assault). Furthermore, it is not an issue whether plaintiff was actually guilty of a felony. *Cf.* United States' Proposed Conclusions of Law, ¶ 7 (asking that I conclude that plaintiff is guilty of the crime of assaulting a federal official, 18 U.S.C. § 111); Plaintiff's Proposed Conclusions of Law, ¶¶ 5–6 (asking for conclusion that plaintiff was innocent of crime because he was protected by state criminal privilege of self-defense).

Plaintiff's actual criminal guilt does not even control the issue of the agents' privilege, because, as discussed below, even if the detainee is innocent, the arresting officers are privileged if they reasonably suspect he committed a felony. Plaintiff's privilege, under the criminal law, to use self-defense to resist arrest may be relevant to whether he committed a crime, but in this case does not help determine the controlling legal issues. Furthermore, the appropriate gauge of the agents' privilege in this case is the civil gauge of whether they could commit an otherwise tortious act without tort liability. The Pennsylvania Crime Code's definitions of privilege are relevant only insofar as subsumed by Pennsylvania tort law.

■ This is a state tort case, not an action for violation of plaintiff's constitutional rights.[5] Therefore, I need not decide if the agents violated plaintiff's constitutional rights, but only if they committed a tort.

■ I also note that the parties have misconstrued the relevance of "false arrest" and "excessive use of force"; neither is a tort. *Cf.* Plaintiff's Proposed Conclusions of Law ¶¶ 3, 7; United States' Proposed Conclusions of Law ¶ 20. Under Pennsylvania law, "false arrest" technically is not a tort. *Gagliardi v. Lynn*, 446 Pa. 144, 149, 285 A.2d 109, 149 (1971); *Restatement (Second) of the Law of Torts* § 118, comment b (1965) [hereinafter cited as *Restatement*], *cited in Gagliardi*, 446 Pa. at 150 nn. 5–6, 285 A.2d at 112 nn. 5–6. "Arrest is a privilege." *Gagliardi*, 446 Pa. at 148 n.3, 285 A.2d at 111, n.3 (citing *Restatement* "Chapter V, especially §§ 118–126"). An arrest, however, may constitute a tort of false imprisonment, assault, and/or battery, if the arrest is not privileged. *Id.* 148 n.3, 149, 285 A.2d at 111 & n.3; *Restatement* § 118, comment b.[6] If on the other hand, the arrest was privileged, the defendants

---

5. Although the Complaint, ¶ 15, alleges that the agents violated the fourth, fifth, and eighth amendments, plaintiff did not plead a cause of action under the constitution. Assuming, *arguendo*, that the complaint contains such a pleading, *see, e.g., Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), subject-matter jurisdiction would not exist. The only defendant in this action is the United States, and because it has consented to be sued only for torts of its agents, the doctrine of sovereign immunity deprives the court of jurisdiction. *See generally, e. g.,* 14 C. Wright & A. Miller, *Federal Practice and Procedure* Civil § 3654 (1976). Furthermore, the facts of this case demonstrate that there was no fourth or fifth amendment violation. Because there was no conviction, the eighth amendment allegation is frivolous. *See, e. g., Romeo v. Youngberg,*

644 F.2d 147 at 156 & n.8 (3d Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981).

6. Defendant misreads *Gagliardi* to say that "the cause of action is one for false arrest and not false imprisonment." United States' Proposed Conclusions of Law ¶ 20. *Gagliardi* actually said that when a false arrest results in false imprisonment, the appropriate statute of limitations (for all torts arising from the arrest) was the one-year limitation for "false arrest" of Pa.Stat.Ann. tit. 12, § 51 (Purdon 1953), *repealed,* Pub.L. 202, Act No. 1978–53, § 2(a) [¶ 1163], 1978 Pa.Laws 202, 310, rather than the normal two-year limitation for "injury wrongfully done to the person." Pa.Stat.Ann. tit. 12, § 34, *repealed,* Pub.L. 202, Act No. 1978–53, § 2(a)[¶ 807], 1978 Pa.Laws 202, 264.

are not liable in tort. *Restatement* § 118. Finally, "excessive use of force" is not a tort. Excessive force negates privilege, *see Restatement* § 131–134, and may constitute the tort of battery.

In sum, this is a state tort action. The essential elements of the alleged torts, as well as the defense of privilege, are in issue and must be judged by Pennsylvania civil standards.[7] In this case, the federal criminal code, the state criminal code, and the Constitution have no independent significance.

### 2. Analysis

In this case, defendant may be subject to liability for five torts: assault, battery, false imprisonment, negligence, and/or malicious prosecution. In addition to denying that these torts were committed, defendant claims the privilege of arrest. In applying the law to the facts, it is useful to have in mind an outline of the torts and the privilege.

Assault requires (1) an act intended to cause harmful or offensive bodily contact, or imminent apprehension of such contact, and (2) actual imminent apprehension. *See Restatement* § 21. The first element of battery is identical to that of assault, *see id.* § 18(1)(a), but battery requires actual contact, rather than fear of contact. *Id.* § 18(1)(b). False imprisonment requires intentional confinement plus either awareness of, or harm from, the confinement. *See id.* § 35. Negligence requires that the breach of a duty of reasonable care proximately cause harm to the plaintiff. *See id.* §§ 280–283, 430. Malicious prosecution requires that prior proceedings (1) have terminated in favor of the accused, and (2) had been brought without probable cause and primarily for other than securing justice.

*See id.* § 653. "An arrest is the taking of another into the custody of the actor for the actual or purported purpose of bringing the other before a court, or of otherwise securing the administration of law." *Id.* § 112, *quoted in Gagliardi,* 446 Pa. at 149, 285 A.2d at 111. *See also Restatement* § 36 (definition of confinement).

On the facts of this case, the agents arguably arrested plaintiff at one of three junctures: (1) downstairs; (2) when Jenkins touched plaintiff's elbow; and (3) when the agents told Belcher that he was under arrest after the altercation broke out. Jenkins' touching plaintiff's elbow constituted neither assault nor battery. Among other things, there was no intention to cause harmful or offensive contact,[8] no intent to cause fear of such contact, and no offensive contact. Jenkins had no duty to avoid touching plaintiff's elbow, nor did he act unreasonably; therefore, he was not negligent. No arrest or imprisonment occurred when Jenkins touched the elbow and encouraged plaintiff to head toward the stairs; plaintiff was free at that time merely to refuse to accompany the agents. Further, as subsequent events demonstrate, at that moment plaintiff was subject to neither custody nor control of the agents, nor was he constrained by their authority or official capacity. For the same reasons, no tort was committed at any time prior to Jenkins' touching plaintiff's elbow.

An arrest occurred subsequent to plaintiff's forceful aggression toward Jenkins. *See Restatement* § 112. Dowling informed plaintiff immediately upon his assault that he was under arrest, and the agents then attempted to effect that arrest. A warrantless arrest by a peace officer[9] is

---

**7.** Federal law could be independently significant in a similar case. For instance, if an act of a party were otherwise privileged under state law, but also a federal crime, the supremacy clause might forbid a state to grant such a privilege against federal employees acting within the scope of their employment.

**8.** "A bodily contact is offensive if it offends a *reasonable* sense of personal dignity." *Restatement* § 19 (emphasis added).

**9.** Secret Service agents:

> are authorized to make arrests without warrant for any offense against the United States committed in their presence or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

18 U.S.C. § 3056(a).

privileged if the arresting officer reasonably suspects that the arrestee committed a felony, or if the officer reasonably suspects that the arrestee participated in an affray committed in the officer's presence.[10] The privilege can be lost for a variety of reasons. *Id.* §§ 127–133. Here, plaintiff was participating in an affray with the agents. Furthermore, they reasonably suspected that he was committing a felony in violation of 18 U.S.C. § 111 [11]—forcibly assaulting a Secret Service agent in the performance of official duties.

Plaintiff argues that he was unsure that the agents actually were federal officers, even after they had identified themselves and shown their badges. Ignorance would help plaintiff only if it negated privilege by requiring an extra element—suspicion of plaintiff's knowledge of the officer's identity—as part of the reasonable suspicion needed to invoke privilege. Here, knowledge of the officer's identity is not an element of the crime, so it certainly need not be a part of the arresting officer's suspicion.

■ Knowledge of the identity or official character of the person assaulted is not an essential element of a § 111 offense. Intent to assault a federal officer is not requisite, merely intent to assault. *United States v. Feola,* 420 U.S. 671, 676–86, 95 S.Ct. 1255, 1259–64, 43 L.Ed.2d 541 (1975). The assault must be intentional, and proof of ability to inflict harm is required for conviction. *United States v. Johnson,* 462 F.2d 423 (3d Cir. 1972), *cert. denied,* 410 U.S. 937, 93

S.Ct. 1396, 35 L.Ed.2d 602 (1973). The purpose of the statute is to protect federal officers performing their duties, and such purpose "is not achieved where individuals are at liberty to resist federal officers in the performance of their duties because of a difference of opinion, whether real or imagined, regarding either the scope or method of those duties." *Id.* 427–28 (footnote omitted). The "federal officer" requirement is merely jurisdictional. *Feola,* 420 U.S. at 676, 95 S.Ct. at 1260.

■ In *United States v. Goodwin,* 440 F.2d 1152 (3d Cir. 1971), the Third Circuit assessed the degree of force necessary for conviction under § 111. The defendant pushed and struggled with FBI agents and attempted to break away from their grasp after they had announced that they were FBI agents and that there was a warrant for the defendant's arrest. *Id.* 1154. The court affirmed his conviction for forcible assault and resistance.[12] Here, plaintiff's initial forcible resistance, before it escalated, resembles that in *Goodwin.* Thus, notwithstanding plaintiff's professed ignorance, the agents reasonably suspected a § 111 violation and were privileged to arrest him.

The initial privilege of arrest may be lost through the use of excessive force. *See Restatement* § 131–134. Under Pennsylvania law, a peace officer making a lawful arrest:

is justified in the use of any force which he believes to be necessary to effect the

---

**10.** *Restatement* § 121(b)–(c). Other events may trigger the privilege of arrest. *See generally id.* §§ 119–121.

**11.** 18 U.S.C. § 111 provides:

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Secret Service agents are among those designated in § 1114 for protection by § 111.

**12.** The *Goodwin* court distinguished between an unprovoked assault on one not known to be a federal officer (a § 111 offense) and the justifiable use of reasonable force in self-defense

due to a mistake of fact as to the federal identity of the officers when the defendant "neither knows nor should know that he is being arrested and reasonably believes that he is being subjected to a hostile attack against his person." 440 F.2d at 1156. This distinction does not help plaintiff, although he asserts that he was unconvinced that the agents actually were federal officers. They had properly identified themselves and shown their credentials. Further, at the time plaintiff initiated forceful resistance, he could not have reasonably believed that he was subject to a hostile attack on his person. Finally, after he started the forceful aggression, he was told that he was under arrest.

arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person . . . .

18 Pa.Cons.Stat.Ann. § 508(a) (Purdon 1973). Thus, as to whatever force Dowling used before firing the gun, he was privileged to use any force he believed necessary to effect the arrest or defend Jenkins. *Id.; see Redding v. Medica*, 411 F.Supp. 272, 276 (W.D.Pa.1976). Dowling believed such force was needed, and his belief was reasonable.

Dowling was justified in the use of deadly force if he believed it was necessary to prevent serious bodily harm to Jenkins.[13] 18 Pa.Cons.Stat.Ann. § 508(a); *see Dolan v. Golla*, 481 F.Supp. 475, 480 (M.D.Pa.1979). Dowling reasonably believed that plaintiff was gaining control of Jenkins' gun and that deadly force was required to prevent plaintiff from killing or seriously injuring Jenkins.

Plaintiff cites three cases in support of his claim for unreasonable use of deadly force. Each is factually inapposite. In *Phillips v. Ward*, 415 F.Supp. 976 (E.D.Pa. 1976), *appeal dismissed*, 575 F.2d 72 (3d Cir. 1978), there was reasonable belief neither in the necessity of deadly force nor that the decedent was the suspect. *Phillips* also is inapposite because it involved no state claim. *Curtis v. Everette*, 489 F.2d 516 (3d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974), was a claim for failure to protect an inmate from a physical attack by another prisoner. In

*Jenkins v. Averett*, 424 F.2d 1228 (4th Cir. 1970), the shooting victim had committed no crime, was never charged with a crime, had dropped his only possible weapon (a tire iron) before the shooting, and the shooting was accidental. *No* force was needed to arrest him. *Id.* 1231. The trial judge therefore held in favor of the plaintiff on his North Carolina assault and battery claim because the officer was grossly and culpably negligent. In contrast, Dowling reasonably believed deadly force to be necessary. There was no negligence on his part. Under all of the circumstances, Dowling's use of deadly force was reasonable.

■ A cause of action for malicious prosecution requires the plaintiff to meet a heavy burden: (1) he must have been acquitted of criminal charges initiated by the defendant; (2) there must have been no probable cause for the arrest or initiation of criminal charges; and (3) the defendant must have acted out of malice, or for a purpose other than bringing the defendant to justice. *Restatement* § 653; *accord, e. g., Martinez v. E. J. Korvette*, 335 F.Supp. 886, 887 (E.D.Pa.1971) (quoting *Restatement*), *aff'd*, 477 F.2d 1014 (3d Cir. 1973); *Publix Drug Co. v. Breyer Ice Cream Co.*, 347 Pa. 346, 32 A.2d 413 (1943). Plaintiff fails to meet this burden. The agents had probable cause to arrest and charge a violation of 18 U.S.C. § 111, and the record is devoid of convincing evidence that plaintiff was arrested or prosecuted for any purpose other than bringing him to justice.

### III. CONCLUSIONS OF LAW

In summary, I make the following conclusions of law:

13. Section 508 embodies a change from prior case law and the *Restatement*. Prior to enactment of § 508, deadly force could not be used to effect a warrantless arrest unless a felony actually had been committed. *See Restatement* § 131(a). Now all that is required is a legal arrest and belief that the force is required to prevent serious bodily harm. *See generally* Comment, *Justifiable Use of Deadly Force in Law Enforcement*, 78 Dick.L.Rev. 115 (1973).

The Secret Service policy on firearms is substantially identical to. § 508(a). That policy states that "a firearm may be discharged only

as a last resort when in the considered opinion of the officer there is a danger of loss of life or serious bodily injury to himself or another person." Secret Service Manual § 266.2.

I have some doubt as to whether the purpose of the shooting can be characterized fairly as a purpose of effecting arrest. It is more probable that the purpose was merely prevention of harm to Jenkins. In that event, the appropriate standard is that of 18 Pa.Cons.Stat.Ann. § 508(d)(1), which is no more stringent than § 508(a).

1. Prior to the altercation, the agents committed no tort against the plaintiff;

2. During the altercation the agents were privileged;

3. The loss of plaintiff's teeth was not proximately caused by an agent of the United States; and

4. Plaintiff was not maliciously prosecuted.

For all the foregoing reasons, judgment will be entered in favor of the United States and against plaintiff.