# Authority of the State Department Office of Security to Investigate Passport and Visa Fraud

Section 209 of the Foreign Service Act of 1980 did not confer on the Inspector General of the Department of State the authority to investigate passport and visa fraud by persons unconnected with the Department of State, and, accordingly, did not limit any inherent or derivative authority the Secretary of State might have to investigate such fraud.

Special Agents assigned to the Office of Security of the Department of State may conduct consensual questioning of individuals and may request that an individual consent to being questioned elsewhere, provided that a reasonable person would understand that compliance with such a request is voluntary.

August 17, 1984

MEMORANDUM OPINION FOR THE DEPUTY LEGAL ADVISER,
DEPARTMENT OF STATE

This responds to your request for our opinion on the following questions:

1. Whether the Secretary's derivative authority to conduct investigations which might lead to criminal prosecution (using Special Agents not assigned to the Inspector General's Office) is in any way limited by the express statutory authority of the Inspector General of the Department of State to conduct similar investigations.

2. If any such limitations are present, what restrictions apply to the Secretary's independent authority to investigate visa and passport fraud through the Office of Security?

3. Whether, and subject to what limitations, if any, Special Agents assigned to the Office of Security have legal authority to approach an individual suspected of engaging in visa or passport fraud and, after presenting their credentials, either request that the individual answer questions on the spot or accompany them to another location for questioning.

## I. Background

The first question poses a very broad issue regarding congressional intent in passing the Foreign Service Act of 1980, 22 U.S.C. § 3929 (FSA). Rather than

175

address in a factual vacuum the many hypothetical instances in which the relationship of the Inspector General's authority to that of the Secretary might be examined, we believe that it is more appropriate to confine our examination to the specific factual situation described in your letter. Viewed in this light, your first and second questions merge into a single question: whether the powers conferred upon the Inspector General by § 209 of the FSA in any way limit whatever "inherent authority" the Secretary may have to investigate passport and visa fraud. We understand the term "passport and visa fraud" to refer to criminal deceit in passport or visa acquisition by persons other than Department of State employees. In contrast, the term "passport and visa malfeasance" describes malfeasance or criminal activity on the part of Department of State employees in obtaining passports or visas for themselves or others. The relevant criminal prohibitions appear to reflect a similar distinction. *Compare* 18 U.S.C. §§ 1542–1546 (fraud and misuse of passports and visas) *with id.* § 1541 (unauthorized issuance). In addressing your question, we have not attempted to analyze the source, validity, or independent scope of the Secretary's asserted authority to investigate passport and visa fraud. Rather, in accord with your request, we have focused our inquiry upon the effect that § 209 has on whatever authority the Secretary may possess in this area.[1]

## II. Analysis

### A. *The Foreign Service Act of 1980*

We begin our analysis of the question whether the Inspector General possesses investigative authority in the area of passport and visa fraud by examining the FSA itself. Section 209 of the FSA, which established the Office of Inspector General of the Foreign Service, centralized primary responsibility in the Department of State's Inspector General for "audit" and "investigative" activities of the Department. *E.g.,* H.R. Rep. No. 992, 96th Cong., 2d Sess. (Part 1) 23 (1980). The FSA charged the Inspector General with responsibility for examining:

> (1) whether financial transactions and accounts are properly conducted, maintained, and reported;

> (2) whether resources are being used and managed with the maximum degree of efficiency, effectiveness, and economy;

---

[1] As a general rule, of course, violations of Title 18 of the United States Code are statutorily committed to the investigative jurisdiction of the Attorney General. *See* 28 U.S.C § 533(1) (Attorney General may appoint officials to detect crimes against United States); *id.* § 533(3) (other investigations regarding official matters under the control of Department of Justice and Department of State as may be directed by the Attorney General). Other departments and agencies may investigate federal crimes only "when investigative jurisdiction has been assigned by law to such departments and agencies." *Id.* § 533. In our view, 28 U.S.C. § 533 establishes that Congress cannot be deemed to have intended to confer investigative authority other than by an express provision to that effect in a statute. We examine the FSA, therefore, in order to determine whether Congress therein conferred authority upon the Inspector General to investigate the federal crimes of passport and visa fraud.

(3) whether the administration of activities and operations meets the requirements of applicable laws and regulations and, specifically, whether such administration is consistent with the requirements of section 3905 of this title [the provision governing personnel practices];

(4) *whether there exist instances of fraud* or other serious problems, abuses, or deficiencies and whether adequate steps for detection, correction, and prevention have been taken; and

(5) whether policy goals and objectives are being effectively achieved and whether the interests of the United States are being accurately and effectively represented.

22 U.S.C. § 3929(b) (emphasis added).

The FSA explicitly incorporated that portion of the Inspector General Act of 1978, Pub. L. No. 95–452, 92 Stat. 1101 (1978 Act), which grants Inspectors General of various agencies certain powers to carry out their statutory duties: (1) to have access to records, reports and other materials; (2) to make investigations and reports; (3) to request assistance from other government agencies; (4) to subpoena documents, except from Federal agencies; (5) to have access to the agency head; (6) to appoint employees; (7) to obtain expert and consultant services; and (8) to enter into contracts. 22 U.S.C. § 3929(e)(1); *see* 5 U.S.C. app. § 6(a) (Inspector General Act of 1978). In addition to those powers, the Inspector General of the Foreign Service also has authority to request that Department of State employees be assigned to him, provided that all individuals so assigned, as well as those appointed under item (6) above, "be responsible solely to the Inspector General." 22 U.S.C. § 3929(e)(2).

*B. Inspector General's Authority to Investigate Passport and Visa Fraud*

On its face, the FSA confers some type of investigative authority on the Inspector General of the Foreign Service. What remains to be determined is whether that authority encompasses the investigation of passport and visa fraud. Although one of the Inspector General's primary responsibilities is to conduct "investigations," that term is not defined in the FSA. Most significantly for our purposes, the language of the FSA does not expressly indicate whether the investigative authority which it conferred was limited to cases of malfeasance committed by ·Department employees or whether that authority also extended to crimes committed by non-employees. In seeking to resolve this issue, we have identified several passages from the legislative history of the FSA which are of assistance in determining Congress' intent. In addition, we have examined the legislative history of the 1978 Act, after which the office of Inspector General of the Foreign Service was "patterned." *See* H.R. Rep. No. 992 (Part 2), 96th Cong., 2d Sess. 22 (1980). The incorporation of part of the 1978 Act into the FSA renders that part of the 1978 Act and its history an

appropriate source of further guidance in interpreting the FSA. *See Engel* v. *Davenport*, 271 U.S. 33, 38 (1926) (adoption of earlier statute by reference makes it fully a part of later statute); 2A Sutherland Statutory Construction § 51.08 (Sands 4th ed. 1973).

The bill considered by the Senate Committee that reported the 1978 Act defined "investigation" to include "inquiries and examinations made to detect, or in response to allegations of, irregularities or violations of law, including misconduct, malfeasance, misfeasance, nonfeasance, fraud, or criminal activity on the part of any employee, person, or firm directly or indirectly connected with the establishment, or operations financed by the establishment." *E.g.*, H.R. 8588, § 11, 95th Cong., 2d Sess. (1978). This definition was later deleted from the bill before passage, not because it was inaccurate, but because "'investigation' is a term with a generally well understood meaning." 124 Cong. Rec. 30954 (1978) (statement of Sen. Eagleton). It is apparent that the deletion was effected solely to remove surplus language, so that the deleted definition can be appropriately used as a guide to determine the scope of the authority that Congress intended to confer upon Inspectors General in the 1978 Act, and, by incorporation, upon the Inspector General of the Foreign Service in the FSA. *See Diamond Crystal Salt Co.* v. *P. J. Ritter Co.*, 419 F.2d 147, 148 (1st Cir. 1969) (rule inferring legislature's disapproval of provision deleted from bill does not apply when omitted provision would have been surplusage). Although the language of the definition is ambiguous in some respects, to the extent that it requires a connection between the person committing the misconduct and the Department, it strongly suggests that Congress intended that the focus of the Inspector General's authority be on the conduct of Department employees or contractors as opposed to the conduct of outside persons who may have occasion to deal with the Department. Thus, this definition suggests that Congress intended to authorize the Inspector General to investigate only passport and visa "malfeasance," as opposed to passport and visa "fraud."

This suggestion is borne out by several aspects of the legislative history of the FSA. Although none alone is dispositive, the several statements in combination provide a persuasive indication that the Inspector General's powers were directed at the internal conduct of the Department and the Foreign Service. First, the House Committee on Post Office and Civil Service explained that Chapter 2, in which § 209 is found, "deals with the management of the Foreign Service generally . . . ." *E.g.*, H.R. Rep. No. 992, 96th Cong., 2d Sess. (Part 2) 22 (1980). That report further declared that a purpose of establishing the office of Inspector General would be to "provide leadership and coordination and recommend policies for activities designed to promote efficiency and to prevent and detect fraud and abuse *in such programs and operations.*" *Id.* (emphasis added). That Committee, therefore, also appears to have contemplated that the Inspector General would confine his investigative activities to the administration of operations as conducted by the Department of State.

The House Committee on Foreign Affairs reported that the objectives to be met by the Inspector General "include systematic examinations of whether

178

financial transactions are properly conducted, whether resources are being used efficiently, whether requirements of law are being met (including the antidiscrimination and antireprisal provisions of section 105 of this bill), and whether there are instances of fraud or other irregularities." *E.g.*, H.R. Rep. No. 992, 96th Cong., 2d Sess. (Part 1) 23 (1980). The phrasing of this list of objectives places an emphasis on employee behavior. For example, the Committee's parenthetical elaboration of its term "requirements of law," which refers to § 105 of the bill, specifies laws applicable solely to Department employees. Further, the reference to "fraud or *other* irregularities" suggests that the fraud mentioned is a species of a broader class of "irregularities" — a term which, by referring to departure from established norms, connotes derelictions of official duty, rather than deceit worked upon Department officials by non-employees. This Committee, therefore, evidently understood the grant of authority to apply to the investigation of acts committed by employees of the Department of State.

Finally, § 209 empowers the Inspector General to "receive and investigate complaints or information *from a member of the Service or employee of the Department* concerning the possible existence of an activity constituting a violation of laws or regulations, constituting mismanagement, gross waste of funds, or abuse of authority, or constituting a substantial and specific danger to public health or safety." 22 U.S.C. § 3929(f) (emphasis added). Of the enumerated derelictions, only the first is capable of general applicability outside the Department. Its context, however, suggests that its purpose, once again, was to facilitate investigations of employees. The articulation of this complementary power in terms of complaints of employees is further evidence that Congress was conferring authority over intra-departmental malfeasance, to which employees would be the most likely witnesses.

In light of these considerations and evaluated against the general rule that the Attorney General will investigate violations of Title 18 in the absence of a statute expressly delegating authority to another department, *see supra* note 1, we believe that Congress should not be regarded as having conferred on the Inspector General, in the FSA, the authority to investigate passport and visa fraud that is, fraud committed in passport application or use by persons not connected with the Department of State. Far from constituting an express delegation of such investigative authority, § 209 and its legislative history persuasively suggest that the power to investigate passport and visa fraud was not embraced at all by the statutory grant. It follows that if the Secretary has some derivative source of authority to investigate passport and visa fraud, then that authority was not supplanted, transferred, or limited by the FSA.[2]

---

[2] We have examined only the statutory grant of investigative authority to the Inspector General and, therefore, express no view on the existence or scope of independent investigative authority in the Secretary with regard to either "fraud" or "malfeasance." We do note, however, that if there were some overlap of authority between the Inspector General and the Secretary in the area of passport or visa malfeasance, the Secretary would not necessarily be ousted of all such power by the FSA. As this Office previously stated generally with respect to the 1978 Inspector General Act, "there is no indication in the Act that Congress intended the agency head to perform [his supervisory] functions at all times through the Inspector General."

Continued

179

## C. Authority of Special Agents

Your inquiry whether Special Agents may conduct questioning and request that an individual accompany them to another spot raises two issues: whether the Office of Security has any authority to investigate passport and visa fraud and whether the type of confrontation described in your letter falls within the scope of that authority. Any authority possessed by the Office of Security is derived either from the Inspector General or from the Secretary, as there does not, to our knowledge, exist any independent grant to that Office concerning passport and visa fraud. We have concluded above that the Inspector General does not have authority under the FSA to conduct investigations of passport and visa fraud. Thus, any investigative authority possessed by the Office of Security in this area must flow from the Secretary. Further, the FSA prohibits the Inspector General's subordinates from serving two masters by providing that *both* the employees appointed by the Inspector General *and* the employees of the Department of State assigned to the Inspector General are to be responsible "solely" to the Inspector General. 22 U.S.C. § 3929(e)(2). This requirement was intentionally imposed to establish an Inspector General staff independent of the Secretary. *See* S. Rep. No. 913, 96th Cong., 2d Sess. 26 (1980). Consequently, Special Agents of the Office of Security assigned to the Inspector General, like the Inspector General himself, would possess no authority to investigate passport and visa fraud. Special Agents not so assigned, and thus responsible to the Secretary, would be able to implement whatever investigative authority the Secretary possesses.

The second issue raised by this particular inquiry involves the contours of permissible investigative activities. We address this question on the assumption that some derivative authority to investigate passport and visa fraud resides in the Secretary and is validly delegated to the Office of Security. Authority to investigate, however, even if granted expressly by statute, would not automatically confer other specific law enforcement powers. Postal inspectors, for example, were held not to derive powers of arrest from the Post Office Department's general statutory authority to investigate postal offenses. *Alexander* v. *United States*, 390 F.2d 101, 105 (5th Cir. 1968). Similarly, the Attorney General's authority to appoint "investigative officials" under 28 U.S.C. § 533 was understood by the Attorney General and the Congress as not sufficient to give FBI agents the power to make arrests or carry firearms, prompting Congress to provide for such powers explicitly fifteen years later. *E.g.*, H.R. Rep. No. 1824, 73d Cong., 2d Sess. 1–2 (1934); *see* Act of June 18, 1934, Pub. L. No. 73–402, 48 Stat. 1008.

---

[2] (. . . continued)

Letter to General Counsel, General Services Administration from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel (Mar. 24, 1983). Any limits on the Secretary's existing power to investigate malfeasance that might be inferred from the FSA would have to be determined on the facts and circumstances involved in a particular class of investigations. The questions raised in your letter do not appear to us to require an analysis of the Secretary's investigative jurisdiction over employee malfeasance.

It is well established that the authority to exercise law enforcement powers must be conferred expressly by statute. In the absence of a federal statute, federal officers have the powers of arrest conferred by the law of the State in which the arrest occurs. *Miller* v. *United States*, 357 U.S. 301, 305 (1958); *United States* v. *Di Re*, 332 U.S. 581, 589 (1948). If state law makes no provision for arrests by federal officers, they have only the authority of a private citizen. *Coplon* v. *United States*, 191 F.2d 749, 753 (D.C. Cir. 1951); *accord United States* v. *Chapman*, 420 F.2d 925, 926 (5th Cir. 1969). It is clear that the Special Agents of the Office of Security have the statutory power to arrest only in their capacity as protectors of certain statutorily specified persons. 22 U.S.C. §§ 2666–2667 (heads of foreign states, official representatives of foreign governments, the Secretary of State, the Deputy Secretary of State, official representatives of the U.S. Government, and families thereof). If an interrogation such as you have described, not involving this protective role, constitutes an arrest, therefore, a Special Agent would not have the authority to conduct it under a general grant of investigative jurisdiction.

There are limits that an investigation may not exceed without acquiring the attributes of an arrest. "In the name of investigating a person who is no more than suspected of criminal activity, the police may not . . . seek to verify their suspicions by means that approach the conditions of arrest." *Florida* v. *Royer*, 460 U.S. 497, 499 (1983) (plurality opinion). In attempting to determine whether particular conduct crosses the line between investigative questioning and arrest, courts generally look at all of the circumstances and the context in which the issue has arisen. *See United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.). Addressing a tort claim of false imprisonment, for example, one court found that no arrest had occurred when an agent touched the plaintiff's arm and encouraged him to head toward an office for questioning. The court reasoned that the plaintiff was subject neither to custody nor to control, nor was he constrained by the authority or official capacity of the agents. *Belcher* v. *United States*, 511 F. Supp. 476, 483 (E.D. Pa. 1981).

Cases decided on the basis of the Fourth Amendment to the Constitution provide the richest source of judicial analysis of the point at which an arrest occurs. "A person is not arrested or seized under the Fourth Amendment if he is free to choose whether to enter or continue an encounter with police and elects to do so." *United States* v. *Brunson*, 549 F.2d 348, 357 (5th Cir.), *cert. denied*, 434 U.S. 842 (1977). Generally, the inquiry involves an objective test of whether the average, reasonable person would have thought that he had been arrested. *United States* v. *Scheiblauer*, 472 F.2d 297, 301 (9th Cir. 1973); *Coates* v. *United States*, 413 F.2d 371, 373 (D.C. Cir. 1969). Thus, if Special Agents ask an individual to accompany them for the purpose of answering some questions and tell the subject that he is not under arrest and that he is free to leave, he will be deemed to have consented to the questioning and not arrested. *United States* v. *Vita*, 294 F.2d 524, 528 (2d Cir. 1961).

Although the above principles have been developed for purposes of determining such matters as the legality of detention, searches, and seizure of

evidence, they also furnish a benchmark from which to measure the limits of activities that fall within the general purview of "investigation." On the basis of our research, we believe that consensual questioning is within a grant of investigative authority. Whether such questioning is consensual will depend upon whether the subject believes that he is free to refuse to answer questions in any location and, therefore, that he is not in custody. It would be helpful in this regard if the credentials that Special Agents display before initiating questioning were revised to reveal these limitations on the authority of the investigating officers and if the agents informed their subjects of these limitations.

## Conclusion

Without analyzing the source, validity, or scope of the authority of the Secretary of State to conduct investigations of passport and visa fraud, we have concluded that the FSA does not change the scope of that claimed authority. The FSA does not confer upon the Inspector General of the Foreign Service express power to investigate passport and visa fraud, and consequently does not withdraw from the Secretary any residual powers he may have over such investigations. We have not attempted to resolve what those residual powers may include. When acting under investigative authority delegated by the Secretary, Special Agents may conduct consensual questioning of individuals and may request that an individual consent to being questioned elsewhere, provided that a reasonable person would understand that compliance with such a request is voluntary.[3]

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[3] NOTE: After this opinion was issued by the Office of Legal Counsel, (1) the Inspector General Act of 1978 was amended to include the Inspector General of the Department of State, *see* Pub. L. No. 99–93, § 150(a), 99 Stat. 405, 427 (1985), and (2) Special Agents of the Department of State were granted specific statutory authority to investigate and make arrests with respect to illegal visa and passport issuance, *see id.* § 125(a), 99 Stat. at 415–16 (codified at 22 U.S.C. § 2709(a)(1)).