**Ronald L. NASH**

v.

**UNITED STATES of America.**

**No. 91–551.**

United States District Court,
E.D. Pennsylvania.

Sept. 28, 1994.

Martina Bernstein, Morgan, Lewis & Bockius, Philadelphia, PA, for Ronald L. Nash.

John N. Joseph, Asst. U.S. Atty., Philadelphia, PA, for U.S.

### BENCH TRIAL MEMORANDUM UNDER RULE 52(a)

LUDWIG, District Judge.

This Federal Tort Claims Act case, 28 U.S.C. §§ 1346, 2671 *et seq.*, grows out of the arrest of plaintiff Ronald L. Nash on February 1, 1989 by three deputized U.S. marshals—Pa. State Trooper Arthur Moss, Philadelphia Deputy Sheriff William Marker, and Philadelphia Police Officer Barbara Smith. Plaintiff claims that in effectuating the arrest the officers used excessive force.[1]

### I.

The following facts are set forth in the parties' pre-trial stipulation:[2]

On February 1, 1989, plaintiff was arrested in the third-floor bedroom of a row house located in Philadelphia. He had been living there since 1987. Previously, he had resided in Texas, where he had been arrested on drug charges. On August 11, 1987, he had failed to appear for a hearing, and the Texas court issued a warrant for his arrest.

In early 1989, the U.S. Marshal's Fugitive Task Force in Philadelphia obtained information that plaintiff was living at 3945 Terrace Street. On February 1, 1989, at about 8:50 a.m., eight law enforcement officers who were members of the Task Force went to that address to serve the arrest warrant. The officers, all in civilian clothes, included Moss, who was in charge, Marker, and Smith. Plaintiff lived in the house with Perry Stocker. When the officers arrived that morning, Stocker admitted them and did not object to their entry or to their going upstairs. When Marker and Smith were on the second floor, he informed them that plaintiff was on the third floor. The officers did not have a search warrant.

Plaintiff's bedroom is at the front of the house at the end of the third-floor hallway, which runs from the staircase at the rear. The bedroom is 10 × 15 feet, with a 29½ inch doorway. It had a king-sized bed and the near side of the bed was about 30 inches from the doorway and the far side about 20½ inches from the outer wall. The hallway from the staircase is 12 to 15 feet long. Plaintiff's bedroom door was open when Moss, Marker, and Smith, in that order, reached the third floor. They had an unobstructed view into the bedroom.

Upon arriving at the third floor, Moss kicked in the door of another bedroom, which made a loud crashing sound. Awakened by the noise, plaintiff crouched down between his bed and the outer wall and saw two of the officers in the hallway, approaching with their guns drawn. He had a loaded .357 revolver.

As the officers proceeded toward plaintiff's bedroom, plaintiff reached up from behind the bed pointing the revolver at the ceiling. The flat part of the gun was parallel to the bed and the outer wall of the bedroom. He did not say anything.

---

1. Initially, this action was brought against the individual officers under 42 U.S.C. § 1983. Summary judgment was granted for defendants because they were acting in the capacity of federal officials. The third amended complaint alleged constitutional violations, *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and intentional state torts. The government was substituted as sole defendant, and the joint pretrial stipulation refers only to the Federal Tort Claims Act law enforcement exception, 28 U.S.C. § 2680(h). In this decision, no other claim has been considered.

2. These facts have been arranged in narrative form.

Moss was first in line, Marker second, and Smith third. Moss and then Marker opened fire. Smith, who was behind Marker did not. Plaintiff received three bullet holes in his neck, bled profusely and was hospitalized for a number of months. Altogether he had eight gun shot wounds to his head, neck, arms, chest and abdomen.

Moss had a .45 caliber pistol and fired five or six times. Marker had a 9mm pistol and fired seven times. Plaintiff did not shoot.

## II.

The following facts are found from the evidence:

The officers had reason to believe plaintiff was in the house based on information received from a neighbor. Trial, June 1, 1994, n.t. 49. Given the number of officers, plaintiff could not have escaped unseen. *Id.* at 37. The officers in the house repeatedly called out "police," including upon their arrival on the third floor. *Id.* at 7, 51, 73–75. Moss said "police" before and immediately after kicking in the other bedroom door on the third floor and again as he entered plaintiff's bedroom. *Id.* at 39–40.

The officers did not see the plaintiff's revolver until they began moving down the third-floor hallway. *Id.* at 6, 24, 57. There was no opportunity for the officers to take cover after passing the first bedroom near the head of the stairs. Trial, May 12, 1994, n.t. 110–112, 121.

When the officers entered his bedroom plaintiff's finger was on the trigger of his revolver. *Id.* at 26, 54. The weapon was initially pointed upwards, but after the officers came down the hallway, plaintiff put his elbows on the bed and aimed the pistol in the officers' direction.

As they entered the bedroom, the officers identified themselves as police, Marker ordered plaintiff to "drop" and Moss ordered plaintiff to "toss" the revolver. Trial, May 12, 1994, n.t. 24. Plaintiff did not do so. Trial, May 12, n.t. 24, 26, 29; June 1, 1994,

n.t. 46, 56. The officers reasonably believed they were going to be shot momentarily by plaintiff.

As he entered the bedroom, Moss saw that plaintiff's revolver was loaded, the hammer cocked, and ready to fire. Trial, June 1, 1994, n.t.53. After Moss fired the first shot, Marker began firing. *Id.* at 27, 65–68. Plaintiff's movements as he was shot made it appear he was shooting. *Id.* at 41, 69. When plaintiff fell onto the bed, the officers took him into custody. *Id.* at 55. He was still conscious and his finger was still on the trigger of his revolver, which was jammed. *Id.* at 12, 71, 72. The time from the officers' order to plaintiff to surrender until they stopped firing was less than a minute. Trial, May 12, 1994, n.t. 28–29, 32; June 1, 1994, n.t. 68. Upon trial in Common Pleas Court in Philadelphia, plaintiff was convicted of resisting arrest, simple assault, recklessly endangering another person and other charges and was sentenced to one and a half to five years imprisonment.[3]

## III.

The sole issue presented is whether the officers were justified in using deadly force, and Pennsylvania law contains the applicable standards. 28 U.S.C. § 1346(b). *See Schrob v. Catterson,* 967 F.2d 929, 934 (3d Cir.1992) (state substantive law governs FTCA case); *Belcher v. United States,* 511 F.Supp. 476, 481 (E.D.Pa.1981) (Pennsylvania law applies to claim based on use of force by a Secret Service agent).

Under Pennsylvania law the use of deadly force is justified if an officer reasonably believes it to be necessary to prevent death or serious bodily injury. 18 Pa.C.S.A. §§ 501, 508(a)(1). Such justification extends to protection of oneself and other persons. *Belcher,* 511 F.Supp. at 484–85 (under Pennsylvania law deadly force was justified where F.B.I. agent reasonably believed deadly force necessary to defend co-agent from serious bodily harm); *Dolan v. Golla,* 481 F.Supp. 475, 480 (M.D.Pa.1979) (deadly force justified

---

3. The sentencing judge said: "I'm sympathetic as a human (sic) with the injuries sustained by the defendant but ... I think the officers acted quite properly in executing their duty and pro-

tecting their own well being...." Plaintiff's criminal defense attorney rejoined: "My client doesn't disagree with the Court." Hearing, Feb. 7, 1991, at 9.

where officer believed own life and partners life was endangered and where necessary to prevent the escape of a person who is thought to have committed a forcible felony and to have a deadly weapon); *Commonwealth v. French*, 531 Pa. 42, 50, 611 A.2d 175, 179 (1992).[4] Here, the issue of justification for the officers' conduct can be reduced to three decisions or phases: Entering plaintiff's bedroom, stopping fire, and ceasing fire.

■ Plaintiff suggests the officers acted unreasonably before they entered his bedroom—in short, that they should have waited for him to emerge and surrender himself. While in hindsight the more circumspect course of action may have been to give plaintiff such an opportunity, at the time it was uncertain and unpredictable what he might try to do or was capable of doing. Moreover, the decision to proceed to plaintiff's bedroom did not itself involve a decision to use deadly force. Only after the officers entered the third-floor hallway did they become aware that plaintiff was armed with a pistol. At that moment, it is unlikely that they could have taken cover. Even if they could have done so, they were under no legal duty to retreat. 18 Pa.C.S.A. § 508; *In re City of Philadelphia Litigation*, 849 F.Supp. 331, 336 (E.D.Pa.1994) (quoting 18 Pa.C.S.A. § 508(a)) (police officer has no duty to retreat when effecting an arrest).

Plaintiff also argues that he was repeatedly shot while trying to hand over his pistol to the officers. Yet he admits that he did not let go of the pistol but instead was moving it, albeit on an angle, toward the officers—who were standing no more than a few feet away. Seeing the loaded and cocked .357 with plaintiff's finger on the trigger coming toward them, the officers' beliefs that their lives were in immediate danger can not be said to have been unreasonable. Even after absorbing the large number of serious wounds, plaintiff's finger was still on the trigger, and the pistol had jammed.

Moreover, as long as the officers perceived plaintiff to be pointing or aiming in their direction, they were entitled to continue using deadly force. *See* 18 Pa.C.S.A. § 508. They fired until he slumped forward on the bed. Until then, a matter of less than a minute, there was no objective indication that he was no longer life-threatening. Although the total number of bullets fired by the two officers at almost point blank range may now appear to have been unnecessary, this evaluation can not be made solely in retrospect. The officers' conduct must be judged from the standpoint of the reality confronting them at the time. *Commonwealth v. French*, 531 Pa. 42, 50, 611 A.2d 175, 179 (1992) (reasonable belief of defendant as to whether force was immediately necessary is standard used in self-defense); *Commonwealth v. James*, 433 Pa. 508, 511–12, 253 A.2d 97, 99 (1969) (reasonable belief standard in self-defense must be founded on facts as they appear at the time of the imminent peril); *Commonwealth v. Hill*, 427 Pa.Super. 440, 446, 629 A.2d 949, 952 (1993) (reasonable belief standard measured in light of facts as appeared to defendant claiming self-defense). When the issue of excessive force is so viewed, plaintiff has not made out a case of liability.

## IV.

The following conclusions are entered:

1. This court has jurisdiction over the action and the parties.

2. The testimony of defendant's witnesses was substantially credible and worthy of belief.

3. Plaintiff Ronald L. Nash did not sustain his burden of proving by a preponderance of the evidence actionable conduct on the part of the deputized U.S. Marshals.

4. It was not established that the use of deadly force by the deputized U.S. Marshals was unreasonable given the threat of immi-

---

**4.** Defendant argues, citing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that what occurred before the officers reached the bedroom is not relevant. Since this is a common law tort claim, the prescripts of constitutional tort claims under 42 U.S.C. § 1983 and the Fourth Amendment do not apply. *Belcher* at 482. Regardless, *Graham* does not negate the common sense principle that reasonableness includes the totality of the pertinent circumstances. *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872.

nent deadly force presented by plaintiff's conduct.

A decision will be entered in favor of the defendant United States of America and against plaintiff.