| | (D.I. 45) JURY | Defendants' Lowest | Highest | Gov't |
|---|---|---|---|---|
| **TRACT 307E** | | | | |
| · per acre, unencumbered | $10,000 | $ 6,000 | $ 10,000 | $10,000 |
| · diminution in value for clearance easements | 10% | 30% | 30% | 25% |
| · diminution in value for clear zone easements | 90% | 80% | 100% | 75% |
| · **JUST COMPENSATION** | $21,730 | $ 8,220 | $ 19,120 | $13,675 |
| **TRUST PROPERTY** | | | | |
| · per acre, unencumbered | $ 2,100 | $ 6,000 | $ 10,000 | $ 2,100 |
| · diminution in value for clearance easements | 10% | 30% | 100% | 10% |
| · diminution in value for clear zone easements | 55% | 80% | 100% | 40% |
| · **JUST COMPENSATION** | $73,979.85 | $203,238 | $409,630 | $62,813.10 |
| **TOTAL JUST COMPENSATION** | $95,709.85 | $211,458 | $428,750 | $76,488.10 |

Isom COOPER, Plaintiff,

v.

Robert MERRILL, "Ace" Harding, Officer Monaghan, James McGaw, Tommy Roe, John Doe I, John Doe II, John Doe III, John Doe IV, City of Wilmington, Delaware, and Borough of Trainer, Delaware County, Pennsylvania, Defendants.

Civ. A. No. 87–592–JJF.

United States District Court, D. Delaware.

April 24, 1990.

Jon J. Auritt of Auritt & Daly, Media, Pa., and Jacob Balick, Wilmington, Del., for Isom Cooper.

Jeffrey S. Goddess of Saul Ewing Remick & Saul, Wilmington, Del., for City of Wilmington.

Robert G. Hanna, Jr. of Marshall Dennehey Warner Coleman & Goggin, Philadelphia, Pa., and Howard M. Berg of Berg Bifferato Tighe & Cottrell, Wilmington, Del., for James McGaw and Borough of Trainer.

## OPINION

FARNAN, District Judge.

This matter is now before the Court on the summary judgment motions of defendants Wilmington, Delaware Police Officer Robert Merrill, the Borough of Trainer, Pennsylvania, and Trainer, Pennsylvania

Police Officer James Magaw.[1] Isom Cooper, a Wilmington, Delaware resident, initially filed this action in the Eastern District of Pennsylvania, pursuant to 42 U.S.C. § 1983, alleging that events occurring on the night of February 28, 1985 infringed his civil rights. Cooper also alleged state law claims of assault and intentional infliction of emotional distress. The action was subsequently transferred to the District of Delaware on a motion by the City of Wilmington defendants. For the reasons stated below, summary judgment will be granted in part and denied in part.

### FACTS

#### I. BACKGROUND

Sometime prior to February 28, 1985, the Delaware State Police ("DSP") obtained an arrest warrant for Cooper for shoplifting from a supermarket. The DSP also suspected that Cooper was responsible for the theft of two VCR's stolen from a Wall to Wall Sound and Video store in February 1985.[2] On February 28, 1985, during the day, DSP officers went to the home of Cooper's girlfriend in Wilmington intending to arrest Cooper on the outstanding warrant(s). Cooper was not at his girlfriend's house, but Cooper's car was there, which the officers impounded and towed. Later that day, DSP officers informed Officer John Hartnett of the Wilmington Police Department ("WPD") about the two crimes Cooper allegedly committed outside of the Wilmington city limits and that Cooper's car had been impounded. The WPD additionally suspected Cooper of being the getaway car driver in several robberies which had occurred on the west side of Wilmington in January of 1985. Prior to February 28th, Officer Hartnett had interviewed Cooper about those robberies while Cooper was in custody on other matters. Both Cooper

and the WPD agree that Cooper was well known to the WPD and had been a reliable police informant in the past; however, according to the WPD, by early 1985 Cooper was no longer considered dependable by the WPD.

#### II. THE NIGHT OF FEBRUARY 28, 1985

On the evening of February 28, 1985, Wilmington Police Detective Hartnett, cruising on patrol with Sergeant Thomas Scully, spotted Cooper driving a Fiat near the intersection of Third and Franklin Streets in the city of Wilmington. Hartnett knew that Cooper's car had been impounded, so Hartnett radioed for a registration check on the Fiat. Hartnett and Scully followed Cooper in their car while waiting for a response to the registration check. Cooper made what Hartnett believed to be evasive, suspicious maneuvers by turning at every corner for four consecutive blocks. Then, just as Hartnett received the report over his radio that the Fiat was not registered to Cooper or anyone else with that surname, Cooper rapidly accelerated onto the southbound I–95 approach ramp near Jackson and Third Streets. In response, Hartnett turned on the emergency lights and siren of his police car, Scully radioed in to the WPD that they were pursuing Cooper, who was wanted for armed robbery and considered to be armed and dangerous, and they pursued Cooper onto I–95. Thus began the high-speed automobile chase which ultimately proceeded through Delaware, Pennsylvania and New Jersey, involving law enforcement officials from at least two of those states.

At the I–95/I–295 split, Cooper made a last minute turn onto I–295 where he proceeded eastbound until making another last minute turn onto Route 13 eventually making his way onto the northbound lanes of I–495.[3] Shortly thereafter, Hartnett and

---

1. Plaintiff, Isom Cooper, has indicated that he will no longer pursue his claims against the following defendants: the City of Wilmington, Delaware, Wilmington Police Officer Thomas Monahan, and Wilmington Police Detective John Hartnett. Plaintiff's Brief in Opposition of Summary Judgment Motions at 1–2.

2. It is unclear whether a warrant was outstanding with respect to the VCR theft as of February 28, 1985. Cooper claims there was no arrest warrant on that charge at that time, but later pled guilty to stealing the two VCR's.

3. In a plea agreement, Cooper pled guilty to Resisting Arrest and Reckless Endangerment regarding these maneuvers during the pursuit.

Scully realized that their pursuit of Cooper might extend beyond Delaware into Pennsylvania. They notified the WPD which, in turn, notified the Delaware County, Pennsylvania Communications radio room. The radio room broadcast a request for all units along I–95 to assist in the pursuit of Cooper and identified him as a robbery suspect who was armed or possibly armed. Officer James Magaw from the Police Department of the Borough of Trainer Pennsylvania, among others, heard the radio report. Magaw and several other Pennsylvania officers thereafter set up a roadblock at the point where I–95 enters Pennsylvania near Route 452.

Cooper managed to avoid that roadblock and continued north on I–95. Magaw and the other Pennsylvania police officers then joined pursuit of Cooper driving at speeds of eighty to ninety miles per hour with their emergency lights flashing and sirens running at all times. Cooper testified that after he avoided the Pennsylvania roadblock he realized for the first time that it was the police who were pursuing him but "irrationally" did not stop. Cooper made a last minute sharp turn off of I–95 onto the approach ramp of the Commodore Barry Bridge. As a result of this action, officers lost control of their Marcus Hook police vehicle and crashed into a sign. Cooper then drove through the toll booths of the Commodore Barry Bridge and turned south on New Jersey Route 130. Officer Magaw, who was following immediately behind Cooper, stated that Cooper tried to run him and other officers off the road in a series of evasive tactics and that Cooper twice reached over to the passenger side of the car in such a way that Magaw assumed he had a gun. Magaw fired at the rear tires of Cooper's vehicle in an attempt to disable the car, but his shot failed to hit the tires or any way disable the car. Cooper then crossed the grass median to the northbound lanes of Route 130, and managed to avoid two or three additional police roadblocks. Still in pursuit, Magaw again shot at Cooper's rear tire and was again unsuccessful. Magaw believes, however, that at least one shot probably hit the body of the car.

Cooper then crossed back over to the southbound lanes of Route 130 heading back toward the toll booths at the Commodore Barry Bridge. He then made a U-turn and proceeded on Route 322 in New Jersey when he lost control of his car and ran off the road in an attempt to negotiate an abrupt turn onto the cloverleaf approach ramp for northbound I–295. Officer Magaw, still immediately behind Cooper pulled his car over to the side of the road, got out and yelled to Cooper to come out of his car with his hands up. Instead, Cooper got out of the vehicle and fled on foot with what Magaw thought was something in his right hand. Magaw drew his gun and followed Cooper on foot. When Magaw thought he saw Cooper quickly turn towards him with a shiny object in his hand, Magaw dropped to the ground and fired four shots at Cooper. None of these shots hit Cooper who continued to run.

A number of the other officers involved in the automobile chase also stopped their cars and pursued Cooper on foot. After hearing Magaw's gunfire, Officer Merrill radioed in to WPD communications that a foot pursuit was underway and shots were being fired and then joined in the pursuit. From the briefs, it appears that approximately eight to twelve officers were pursuing Cooper on foot while Hartnett and Scully, who had fallen behind in the automobile chase, were still following in their patrol car trying to catch up to the others. After the initial gunfire from Officer Magaw, other officers on foot fired several shots. The volume of shots being fired apparently led several officers to believe that Cooper was returning fire. No officer specifically saw a gun in Cooper's hand although according to Cooper, certain officers should have had a clear view of him at different points during the pursuit. It was later learned that Cooper did not have a weapon. Throughout the foot chase, Cooper did not respond to calls that he should give himself up. Cooper eventually led officers to a bushy area where he attempted to hide himself. As the officers were searching the area, Cooper emerged from the brush and was spotted by Officer Merrill who

yelled out "over here" to the other officers. At this point both Cooper and Merrill testified they were approximately fifteen to twenty feet apart. Officer Merrill told Cooper to freeze. Cooper, however, ignored Merrill's command and dropped back down into the weeds. Merrill then yelled "Police! Put your hands where I can see them." In response to this command, Merrill saw Cooper jump out of the weeds and begin to run toward him. Merrill testified he could not see Cooper's hands, but perceived Cooper to be a threat to his safety and shot at him. The shot apparently hit Cooper who gasped but did not fall down. When Cooper appeared to make another threatening movement toward Merrill, he fired two more shots at Cooper.

According to Cooper's recollection, all the officers were behind him when he reached the end of the bushes which had concealed him from view. Cooper states that he turned around to get back in the bush and was tripped by sticker bushes and fell down. Cooper then decided that he was exhausted and would walk to the road and give himself up. At that point, Cooper says he heard words such as "Freeze! Stop! Police!" Cooper states that he did stop, put his hands up and as he turned around toward the voice, Officer Merrill fired two shots at him. Cooper stated that the first bullet hit him in the neck and a second bullet hit him in the left shoulder spinning him back onto the highway.[4] Thereafter, Officer Hartnett caught up with Cooper, arrested and handcuffed him, took him into custody, and drove him to a hospital. He remained in the hospital for eleven days during which time he underwent a surgical procedure to remove the bullet from his left shoulder.

Cooper currently maintains § 1983 claims (1) against Officer Merrill for violation of Cooper's Fourth, Fifth, Eighth, and Fourteenth Amendment rights by virtue of improper seizure by shooting; (2) against Officer Magaw for deprivation of plaintiff's rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitu-

tion; and (3) against the Borough of Trainer, Pennsylvania for its unconstitutional policy or lack of policy with respect to the use of deadly force generally and in the context of a high-speed automobile chase, and for failure to adequately discipline, supervise and/or train the Borough's police officers. Cooper also maintains state law tort claims against each of the above defendants. Defendants have filed for summary judgment on all of Cooper's claims. For the reasons stated below, the Court will deny defendant Merrill's motion for summary judgment on the § 1983 claims based upon the Fourth or Fourteenth Amendment and state law claims, but grant summary judgment on the Fifth and Eighth Amendment claims. The Court will grant the motion of defendant Magaw, and deny the motion of the Borough of Trainer, Pennsylvania.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). When the moving party has discharged this burden, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

The requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Substantive law identifies which facts are "material" and only disputes over facts that "might affect the outcome of the suit under the governing law" will defeat summary judgment. *Id.* A factual dispute is

---

**4.** The medical examiner stated that the same bullet may have struck Cooper in both the neck and the shoulder.

"genuine" if a reasonable jury could return a verdict for the non-movant. *Id.; see Williams v. Borough of West Chester, Pennsylvania,* 891 F.2d 458, 460–61 (3d Cir.1989) (non-movant must produce more than mere scintilla of evidence to successfully oppose summary judgment). Inferences will be viewed in the light most favorable to the non-movant and doubts as to the existence of genuine issues of material fact will be resolved against the movant. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 900 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The judge's function at the summary judgment stage is merely to determine whether there is a genuine issue of fact for trial or whether the evidence is so one-sided that one party should prevail as a matter of law. *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. The judge should not to weigh the evidence or determine the truth of any matters in dispute. *Id.* 477 U.S. at 252, 106 S.Ct. at 2512.

## II. OFFICER MERRILL'S MOTION FOR SUMMARY JUDGMENT

Officer Merrill argues that although he and Cooper dispute certain facts, none of these facts are material to whether he had probable cause to use deadly force and therefore he is entitled to summary judgment as a matter of law. In essence, although the argument does not appear in his briefs, Merrill contends that since he acted reasonably and the use of force was justified, he is entitled to the protections of the defense of qualified immunity.

### A. *Section 1983 Issues*

The initial inquiry in a § 1983 action focuses on two issues: 1) whether the conduct complained of was committed by persons acting under color of state law; and 2) whether the conduct deprived a person of the rights secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (*Parratt* overruled to extent it holds negligent conduct by state official is action-able under § 1983). Since defendants essentially concede that they were acting "under color of state law," their arguments are directed to the lack of specific constitutional deprivations. For his part, Cooper alleges that Merrill has deprived him of his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.

In *Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court noted that the initial inquiry in an excessive force claim under § 1983 is the alleged infringement of a specific constitutional right by the challenged application of force. *Id.* 109 S.Ct. at 1870. The Court stated that "in most instances, that will be either the Fourth Amendment ... or the Eighth" and further noted that the claim's validity must be judged with respect to a specific constitutional standard that governs the right rather than a generalized excessive force standard. *Id.* The Court then stated that where the excessive force claim arises in the context of an arrest or investigatory stop, it is most properly characterized as one invoking the protections of the Fourth Amendment. *Id.* at 1871. The Court concluded that *"all* claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 1871 (emphasis in original). The Supreme Court thus settled the question of the proper constitutional provision under which these claims should be litigated. Although the parties' arguments focus on a substantive due process violation, the Fourth Amendment analysis is now considered the appropriate one.

■ The Fourth Amendment provides an "inestimable right of personal security," *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), and any analysis of actions under the Fourth amendment involves an inquiry into the propriety of the use of force under the

facts of the case given the general proscription against unreasonable seizures. *Id.* 392 U.S. at 20, 88 S.Ct. at 1879. The reasonableness of a particular government invasion of a citizen's personal security is the central inquiry. *Id.* at 19, 88 S.Ct. at 1878. Determining whether the force used to effect a seizure is reasonable under the Fourth Amendment requires a careful balance of the nature of the invasion on the individual's Fourth amendment interest against the government's interest.[5] *Id.* at 21, 88 S.Ct. at 1879; *see also Graham,* 109 S.Ct. at 1871 (citing *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)) (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983) (examine government interest and nature of seizure under Fourth Amendment)). The reasonableness standard employed in such cases is objective, and entails analysis of the facts of each particular case including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Graham,* 109 S.Ct. at 1871–72. Merrill argues that he had probable cause to use deadly force in accordance with *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and that his actions were neither shocking or reckless so as to constitute a fourteenth amendment violation. *Garner* provides that the use of deadly force to prevent escape is constitutionally permissible when an officer has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others, and that prior to using such force, if feasible, the officer warns the suspect. *Id.* 471 U.S. at 11–12, 105 S.Ct. at 1701.

■ Cooper and Merrill agree that Officer Merrill shot at Cooper while both men were on foot after a high speed car chase and foot pursuit of Cooper by Merrill and other officers. They also agree that during foot chase, several officers fired shots at Cooper, and that Cooper and Merrill were approximately fifteen to twenty feet apart just prior to Cooper being struck by shots from Merrill's weapon. Also undisputed is that when Merrill's shots struck Cooper, Cooper was seized within the context of the Fourth amendment, thus implicating his rights thereunder.

On the other hand, Cooper and Merrill strongly disagree with respect to Cooper's actions immediately preceding Merrill's shooting of Cooper. Merrill alleges that Cooper failed to freeze as ordered, and instead dropped back into the weeds and seconds later sprang back up running towards Merrill. Thus, Merrill alleges that as a matter of law, in accord with the dictates of *Garner,* his use of force was reasonable. Cooper, on the other hand, alleges that he accidentally fell into the weeds before hearing the command to freeze and that after Merrill ordered him to freeze, Cooper stood up, raised his hands in surrender and turned towards Merrill, and therefore, it was unreasonable for Merrill to shoot at him. It is this material factual dispute which precludes a grant of summary judgment in favor of Merrill. This is because in ruling on a motion for summary judgment, all inferences must be viewed in the light most favorable to the non-movant. *Baker v. Lukens Steel Co.,* 793 F.2d 509, 511 (3d Cir.1986). If the factfinder credits Cooper's version of his conduct just prior to his being shot and injured rather than Officer Merrill's version, it is possible that they may find that Merrill's use of force in seizing Cooper was unreasonable, unnecessary and reckless. Defendant Merrill's own brief concedes that "there is an undeniable dispute in the recollections of the two men [Cooper and Merrill] with respect to details during this last few seconds in the action." Defendant Merrill's Reply Brief at 5. Merrill argues that this dispute

---

5. Recognizing that the reasonableness of any use of force entails such a balance, the Court in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), simply employed the same balancing test in reaching its conclusion that the use of *deadly* force in pursuit of a fleeing felon is reasonable when the officer has probable cause to believe that the suspect poses a threat of harm to the officer or others and that prior to using force, if feasible, the officer warns the suspect. *Id.* 471 U.S. at 8–9, 11–12, 105 S.Ct. at 1699–1700, 1701.

is not material, but the Court is persuaded that the relevant dispute does raise a genuine issue of material fact which must be resolved at trial.

▮ The Court is also precluded by this material factual dispute from granting summary judgment based upon Merrill's defense of qualified immunity at this stage of the proceedings. In a qualified immunity analysis, the Court must determine whether a reasonable person could have believed that defendant's actions were lawful in light of clearly established law and the information defendant possessed at the time of the incident. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Henry v. Perry*, 866 F.2d 657, 659 (3d Cir.1989). The right that the official is alleged to have violated must be clearly established. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. A right is "clearly established" when the contours of that right existing at the time of the allegedly unlawful action were sufficiently clear such that a reasonable officer would understand that his actions violate that right. *Id.* 483 U.S. at 639, 640, 107 S.Ct. at 3038, 3039. In order for the governing law to be clearly established, it is not necessary that there exist a previous precedent on point. *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989). " '[S]ome but not precise factual correspondence' to precedent" is necessary in order for defendant to be charged with knowledge with regard to the lawfulness of his actions. *Id.* (quoting *People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 144 (3d Cir. 1984)).

▮ A plaintiff can overcome a qualified immunity claim by showing the right allegedly violated was clearly established and that there is evidence creating a genuine issue as to whether the defendant committed acts in violation of that clearly established law. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

▮ At the time this incident occurred, plaintiff enjoyed a clearly established constitutional right to be free from unreasonable interference from the police. A citizen also enjoys the right to be free from seizures or applications of force by a police officer which exceed that which is reasonable and necessary under the circumstances. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In addition, the protection of fundamental liberties by the fourteenth amendment extends to an individual's abusive exercise of powers which inflict grossly undue harm. *Black v. Stephens*, 662 F.2d 181, 188 (3d Cir.1981), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). Deprivations of an individual's life, liberty, or property interests would violate the fourteenth amendment if they were such that they "shocked the conscience". *See Rhodes v. Robinson*, 612 F.2d 766, 771–72 (3d Cir.1979) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

▮ The inquiry with regard to Merrill's entitlement to qualified immunity must focus upon whether a reasonable officer in Merrill's position would know that the his actions violated the law. Based on the evidence adduced by both parties and the inferences to be drawn therefrom as outlined above, two distinct characterizations of the incident are possible. In one scenario, as Merrill asserts, the force may have been reasonably necessary and justified by the circumstances, and by analogy, not reckless or shocking. After catching up to Cooper, alone in the dark in a wooded area after the automobile pursuit from Delaware, Merrill commanded Cooper to give up. Cooper did not, and turned toward Merrill and Merrill, who perceived Cooper to be a threat to his safety, shot three times at Cooper.

However, in deference to Cooper another scenario is possible. *See Mitchell*, 472 U.S. at 526, 527, 105 S.Ct. at 2815, 2816 (recognizing that denial of summary judgment may represent a court's conclusion that

defendant is not immune if the facts are as asserted by plaintiff); *Good v. Dauphin County Social Services for Children and Youth,* 891 F.2d 1087, 1094–95 (3d Cir.1989) (court accepts plaintiff's sworn version of the facts). After Cooper fell back into the woods, he decided to give himself up. In response to the command to "Freeze", he stood up again, raised his hands and turned toward Merrill in surrender, thus the officer need not have used the type of force employed by Merrill against Cooper. Given these facts, a reasonable officer would understand that his actions violated Cooper's rights. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. One might also maintain that firing a second and third time at close range at a wounded man who did not possess a weapon is clearly a shocking and reckless action and an obvious manifestation of a use of unreasonable force. *See Jenkins v. Averett,* 424 F.2d 1228 (4th Cir. 1970) (actions of officer who shot boy after chase as he stood facing the officers without a weapon found wanton and reckless, a constitutional violation). Because the Court concludes that there is a genuine issue of fact, on the present record, the Court cannot find at this stage of the proceedings that as a matter of law the force employed by Merrill was reasonable, and not shocking or reckless under the circumstances or that a reasonable officer could conclude that the actions were lawful. Accordingly, Merrill's application for qualified immunity from suit under § 1983 must be denied. The factfinder must determine if Merrill acted reasonably and with justification, in his encounter with Cooper. *See generally Green v. Carlson,* 826 F.2d 647, 652 (7th Cir.1987) ("If there are issues of disputed fact upon which the question of immunity turns ... the case must proceed to trial.")

■ In addition to his claims under the Fourth amendment, Cooper asserts claims predicated on violations of his Fifth and Eighth Amendment rights. However, Cooper's complaint fails to plead factual allegations in support of violations of these rights. For example, the protections of the Eighth Amendment are not available to Cooper since he was not a convicted prisoner at the time of the alleged violation, and the Eighth Amendment applies only to convicted prisoners. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). "The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977). Plainly stated, the Fifth and Eighth amendments cannot provide the underlying constitutional deprivations for purposes of § 1983 on the allegations pled by Cooper and to the extent that Cooper bases his claims on such deprivations Merrill's motion for Summary Judgment must be granted.

### B. State Law Issues

■ In view of the Court's holding on Cooper's federal claims, Merrill's assertion of immunity under the Municipal Tort Claims Act (the "Act"), Del.Code Ann. tit. 10 § 4011 et seq., (1988 Cum.Supp.) with regard to Cooper's state law tort claims based on assault and intentional infliction of emotional distress must also be denied. The allegations contained in Count II of the Complaint combined with the record evidence that gives rise to the material factual dispute on Cooper's federal claims could lead a factfinder to conclude that at the time Merrill shot Cooper, he acted outside the scope of his employment. Del.C.Ann. tit. 10 § 4011(c). This would occur if the evidence at trial establishes that Merrill's act of shooting Cooper was unreasonable in the sense that it was wantonly negligent, willful, or done with malicious intent. *Id.* Thus, the Court concludes that the evidentiary record presently available precludes summary judgment on Cooper's state law claims that pertain to Merrill's conduct under state law.

### III. OFFICER MAGAW'S SUMMARY JUDGMENT MOTION

Officer Magaw argues that because he complied with the Pennsylvania statute regarding police chases or pursuits and be-

cause the alleged violations of Cooper's rights are not supported by case law, he is entitled to summary judgment on plaintiff's § 1983 claims as a matter of qualified immunity. In the alternative, Magaw argues that he is entitled to summary judgment because he did not hit Cooper, nor did he disable Cooper's car with his gunfire; therefore, there is no genuine issue of material fact with respect to the use of excessive force. Finally, Magaw argues that summary judgment should be granted in his favor because he had probable cause to use deadly force since Cooper tried to run officers off the road and Cooper's actions inside his car led Magaw to believe Cooper had a gun. The Court will first examine the doctrine of qualified immunity as it pertains to Officer Magaw's assertions.

### A. Qualified Immunity

As noted above, the doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The qualified immunity issue is one of law, and enables its holder to assert the right not to stand trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526–28, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). The Court must therefore determine the "objective (albeit fact-specific) question" whether a reasonable person could have believed that the individual defendant's conduct was lawful in light of clearly established law and of the information the individual defendant possessed at the time of the incident. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Good v. Dauphin County Social Services*, 891 F.2d 1087, 1092 (3d Cir.1989).

The § 1983 claims of plaintiff are framed as one contention. Cooper alleges that Magaw acted intentionally, maliciously, wantonly, recklessly and in a manner that shocks the conscience and used excessive force, which denied Cooper's due process interest in being free from an excessive use of force. Thus, the Court will turn to a survey of the state of the law at the relevant time, and then to the attendant circumstances and information available to Magaw in this case. *Good*, 891 F.2d at 1092.

The Fourth Amendment provides a right of personal security, *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), which is not to be violated by an unreasonable seizure. *Id.* 392 U.S. at 20, 88 S.Ct. at 1879. The reasonableness of a seizure entails a balance of the individual's interests versus the interests of the government. *Id.* at 21, 88 S.Ct. at 1879. In addition to the Fourth Amendment requirements, the "shock the conscience" substantive due process test was also firmly entrenched in the decisional law as the standard by which violations of an individual's life, liberty, or property interests under the fourteenth amendment would be judged. *See Black v. Stephens*, 662 F.2d 181, 188–89 (3d Cir.1981) (conduct found to shock the conscience when unidentified officer brandished revolver close to plaintiff's head and threatened to shoot), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Davidson v. Dixon*, 386 F.Supp. 482, 487–89 (D.Del.1974), *aff'd*, 529 F.2d 511 (3d Cir.1975) (applying test of whether actions of police shocked the conscience); *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Magaw also argues that his actions were in compliance with, and specifically guided by, the Pennsylvania statute on the use of force in pursuit of felons which provided the clearly established law on the use of force at the time of the incident. Pennsylvania's statute provides:

§ 508 Use of Force in Law Enforcement

(a)(1) [An officer] is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. How-

ever, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:

(i) such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(ii) the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

18 Pa.C.S.A. § 508(a)(1).

The statute was applied in a case factually similar to the instant case where the court found no excessive force had been used by the officer. In *Dolan v. Golla*, 481 F.Supp. 475 (M.D.Pa.1979), *aff'd*, 633 F.2d 209 (3d Cir.1980), a police officer pursued a van using sirens and lights on the basis of traffic violations observed by the officer. *Id.* at 477. During the pursuit, the pursued driver rammed the police cruiser three times. *Id.* at 478. A student observer in the cruiser was directed by the police officer, the driver of the cruiser, to shoot the left rear tire of the van in an effort to incapacitate and stop it, but missed. *Id.* When the van became disabled because of road conditions, the officer approached and ordered the driver out of the van. *Id.* The driver refused and fired at the officer, wounding him. *Id.* The officer then shot the driver. *Id.* The driver brought an action under § 1983 for Fourth Amendment violations, including arrest without probable cause and the use of excessive force. *Id.* at 479. After a three day bench trial, the court noted that the police officer may not use force which far exceeds that which is reasonable and necessary under the circumstances and found that the defendant did not use excessive force. *Id.* at 480. The court based its holding on its determination that the officer had a reasonable belief that the plaintiff would try to injure him in order to facilitate the escape and found the officer's actions to comport with the requirements of § 508(a)(1). *Id.* Other decisions apply

the Pennsylvania statute to an officer's use of force to effect an arrest. *See also Belcher v. United States*, 511 F.Supp. 476, 485 (E.D.Pa.1981) (officer justified in use of deadly force if believed necessary to prevent serious bodily harm); *Phillips v. Ward*, 415 F.Supp. 976 (E.D.Pa.1975) (use of deadly force on fleeing felon acceptable if officer has reasonable grounds to believe it is necessary to prevent death or serious injury).

Magaw is entitled to immunity if the information that *he* possessed on February 28, 1985, was such that a reasonable person would believe that the force used was reasonably necessary under the circumstances and in light of the above discussed law. *Good*, at 1092, 1094.

■ Initially, the issue of whether a reasonable officer would believe that defendant's use of force complied with the Pennsylvania force statute must be resolved. With respect to Pennsylvania's statute, this boils down to whether a reasonable officer would have believed that: 1) the officer or others were in imminent danger of harm; 2) a felony had occurred; 3) the person being pursued was dangerous or possessed a weapon; 4) escape was imminent and force was necessary to prevent it. In determining the application of qualified immunity, the Court must view the facts in the light most favorable to the non-movant. *See Holman v. Walls*, No. 86–1–JRR, 1989 WL 66636 (June 13, 1989), slip op. at 25.

■ The actions of Officer Magaw involved two instances of firing shots from a handgun, or 9mm automatic at or near plaintiff and his car in addition to the pursuit of plaintiff. The first shots fired by Magaw during the vehicular chase were directed at the rear tires of Cooper's vehicle. This action was undertaken by Magaw after seeing or hearing the following undisputed facts: 1) a radio report which identified plaintiff as a robbery suspect fleeing from Delaware police possibly armed and dangerous; 2) the Delaware police were in hot pursuit; 3) Magaw participated in a roadblock across I–95 which plaintiff

eluded; 4) Magaw thereafter participated in high speed vehicle pursuit of Cooper; 5) Magaw observed at least one police car becoming disabled as a result of Cooper's maneuvers; 6) Magaw observed Cooper's driving and periodic leaning toward the passenger side of the car which Magaw believed was for the purpose of reaching for or utilizing a weapon.

Cooper argues that he did not commit a felony or have any weapon, nor did he ever hit a police car during the course of the chase. The Court's focus however, must be whether the belief held by the officer was objectively reasonable and sufficed to justify the officer's behavior under the circumstances. *Brennan v. Hendrigan*, 888 F.2d 189, 194 (1st Cir.1989). Cooper has offered no evidence that disputes his involvement in the car chase, or the broadcast heard by the police, including Magaw, that alerted them that the Wilmington police were in pursuit of a fleeing armed and dangerous robbery suspect. Magaw testified that he saw Cooper reach over, and assumed that Cooper was armed. Testimony cited by Cooper to dispute Magaw's statement simply establishes that no one could see directly *into* the passenger seat or passenger compartment, because the view was from above Cooper's shoulders, but does not dispel Magaw's belief that Cooper lunged toward the passenger door. Thus, an officer in Magaw's situation could reasonably believe that Cooper was armed. Even if Cooper was unarmed, Magaw observed his erratic and dangerous driving, his behavior in the car, and the fact that this driving led to the disabling of a police vehicle, and reasonably concluded that Cooper was a dangerous threat to both officers' and citizens' safety and was not going to obey the police command to stop. In such a situation, a reasonable officer would surely believe that force was necessary to prevent Cooper's escape and to protect others. Thus, the Court concludes that Magaw's beliefs were all within the realm of reason under the circumstances and all within the purview of § 508. The inquiry focuses then on whether the specific facts known would lead a reasonable officer to believe that the amount of force used by Magaw was reasonable and necessary under the circumstances.

The reasonableness of an officer's use of force depends on a balance of the right of personal security and nature of the intrusion against the government interests. *See United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Magaw used force in an effort to seize or effect the arrest of Cooper. A seizure occurs when an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Although Magaw's attempts to disable the Cooper vehicle and stop Cooper failed, his use of force impinging upon Cooper's fourth amendment right to personal security must still be tested by the reasonableness standard. Reasonableness is a changeable concept, dependent upon circumstance. Here, the circumstances involve a situation where police are attempting to stop an allegedly fleeing felon who had led them on a chase through three states. It is a generally accepted notion that police have a right, perhaps even a duty, to apprehend dangerous law violators. As one court has stated, "[W]e must not forget that the primary duty was upon the pursued to stop ... It is hardly necessary to point out the overriding public policy of apprehending criminals as rapidly as possible, thus eliminating continued criminal acts." *State of West Virginia v. Fidelity & Casualty Co. of New York*, 263 F.Supp. 88, 90–91 (S.D.W.Va.1967). Thus, concern for public safety and law enforcement was high. Moreover, Magaw took all reasonable safety precautions. The undisputed facts show that at all times Magaw employed his lights and sirens during the chase, in compliance with Pennsylvania's statute regulating the conduct of emergency vehicles during a chase. *See* 75 Pa.C. S.A. § 3105.

Balanced against this combination of governmental interests is the limited nature of the actual intrusion. Cooper asks this Court first to take judicial notice that if a tire is shot out at high speed, the driver

and others could be killed and then to conclude that the decision to chase and shoot at the rear tire was reckless, grossly negligent and not one taken by reasonable police officers with the same information as Magaw. The Court is not convinced. Magaw and the other officers attempted to get Cooper to stop. Magaw believed that Cooper was armed. He positioned his car close to Cooper's and shot at the rear tire. Magaw did not fire with abandon into the passenger compartment of Cooper's vehicle, nor did the vehicle ever become disabled as a result of any shots or application of force.

Qualified immunity does not protect reckless, plainly incompetent or knowing law violators, *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), but it does protect other state actors. Officers are immune unless they were aware that their actions violated clearly established law. On the undisputed facts, an officer with the same knowledge as Magaw could not have believed that this conduct violated either the state statute or was unreasonable or so reckless as to violate the fourth and fourteenth amendments.

Moreover, with regard to the shots fired after Cooper left his car, Cooper paints a picture of exiting his disabled car at a run because, "if they'd shoot at my car, they'd shoot at me," never turning back and hearing shots being fired at him. Magaw asserts that Cooper stopped and abruptly turned toward him with a shiny object in his hands, but a court must view the facts in the light most favorable to the non-movant. Plaintiff does not dispute however, that when the automobile chase terminated, Magaw yelled "Get out of the car, put your hands up," and that he failed to heed that very specific warning.

Cooper continued to flee in an attempt to further elude the police whom he had already eluded through three states. With the memory of the chase and its attendant circumstances including his belief from the radio broadcast that Cooper was an armed or possibly armed felon, fresh in his mind, Magaw chased Cooper in an attempt to

effect his arrest. Magaw believed from Cooper's prior actions that Cooper was a safety threat with more than an inclination simply to flee. Deadly force is permitted by the Pennsylvania statute when necessary to stop the escape of a person to be arrested for committing a felony or who is attempting to escape and possesses a deadly weapon or other indication that he will endanger human life. Magaw knew that he was chasing one who had committed a felony, was armed or possibly armed, and had exhibited dangerous propensities during the course of the chase. In addition, Cooper not only attempted to escape, but did escape the shots fired. Using such force in a good faith attempt to thwart the escape appeared the only means available.

While the Court is wary of viewing the situation through the perfect lens of hindsight, the Court concludes that a reasonable officer would believe that this force was justified under § 508 as well as within the bounds of reasonableness. Thus, the Court also concludes that Magaw is protected by qualified immunity. Because the Court concludes that Magaw is entitled to qualified immunity, it is not necessary to reach the alternate grounds advanced by Magaw in support of summary judgment.

While the complaint contains allegation of violations of his Fifth and Eighth Amendment rights, Cooper offers no factual allegations that would tend to demonstrate that any of the rights protected by the Fifth or Eighth Amendments have been violated. Therefore, for the reasons stated in Part II.A. *post*, to the extent that Cooper bases his claims on deprivations of the rights guaranteed by the Fifth and Eighth Amendments by Officer Magaw, Magaw's application will be granted.

#### B. *State Law Claims*

In Count VIII of the Complaint, Cooper raises state law tort claims against Officer Magaw based on assault and intentional infliction of emotional distress. In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court held that federal courts have the power to hear

state law claims that "derive from a common nucleus of operative fact" with federal claims. *Id.* at 725, 86 S.Ct. at 1138. Once a court disposes of the plaintiff's federal claims, however, the decision to retain jurisdiction over the pendent state claims lies within the court's discretion. *Shaffer v. Board of School District of Albert Gallatin Area School District*, 730 F.2d 910, 912 (3d Cir.1984). In exercising its discretion, a court must consider the principles of comity, judicial economy, convenience and fairness to litigants. *See Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (doctrine of discretion, not of plaintiff's right).

The primary justification for exercising pendent jurisdiction is missing if the substantive federal claim to which the state count could be appended is no longer viable. *Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir.1982). In the absence of such viable federal claims, the state claims should be dismissed. *Id.* Investment of time devoted to the federal court lawsuit is not controlling. *Shaffer*, 730 F.2d at 912. Here, no federal claims remain against Officer Magaw. Consequently, based on the interests of judicial economy, convenience, and fairness, no good reason compels the exercise of pendent jurisdiction over the state law claims and therefore, the state law claims contained in Count VIII will be dismissed.

## IV. BOROUGH OF TRAINER, PENNSYLVANIA'S SUMMARY JUDGMENT MOTION

### A. *Section 1983 Claims*

The Borough of Trainer, Pennsylvania argues that it is entitled to summary judgment on Cooper's § 1983 claims because Cooper's allegations fail to state a claim against the Borough for municipal liability. Trainer argues that it relies upon the Pennsylvania statute on the use of deadly force as its deadly force policy and the Pennsylvania emergency vehicle statute as its pur-

suit policy, and that the decision to use these statutes as its policy is constitutional. Accordingly, Trainer concludes that Cooper can adduce no evidence of a policy or custom, the execution of which denied plaintiff his constitutional rights.[6]

Cooper disputes Trainer's contentions and argues that Trainer has no policy, training or procedure regarding high speed police pursuits and shooting at fleeing automobiles or that Trainer has a policy of not training officers in the use of deadly force. He asserts that since officers participated in a number of chases per year the Borough knew or should have known that its lack of procedures and training led to or encouraged unconstitutional conduct on the part of its officers. In addition, based on Magaw's recollection of when the use of deadly force is appropriate, Cooper argues that the Borough has an unconstitutional policy on the use of deadly force. Thus, Cooper argues that Trainer's actions caused a deprivation of his constitutional rights so that summary judgment is inappropriate.

The liability of a local government is controlled by *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which established that a local government cannot be held liable on a respondeat superior theory. *Id.* 436 U.S. at 694, 98 S.Ct. at 2037. The execution of a government policy or custom must inflict the injury and be the moving force behind the alleged constitutional violation. *Id.; City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) (need direct causal link between policy and alleged constitutional deprivation).

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom

---

**6.** Despite Trainer's contention, the doctrine of qualified immunity cannot be applied to munic-

ipal agencies. *Good*, 891 F.2d at 1096.

the police come into contact." *Id.* 109 S.Ct. at 1204. Only where a municipality's failure to train evidences "deliberate indifference" to the rights of citizens can the shortcomings be properly thought of as a policy (a "deliberate" or "conscious" choice by the municipality) or custom that is actionable under § 1983. *Id.* at 1205. In addition, the policy must be the moving force behind the constitutional violation. *Id.* The Court defined "deliberate indifference" as:

[I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* In a footnote, the Court provided an example of when a municipality could held liable for a failure to train:

[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at n. 10 (citation omitted).

 A § 1983 plaintiff must show more than "but for" causation because, according to the *Canton* Court, it is not sufficient to show that the injury could be avoided if the officers where trained sufficiently to equip them to avoid the particular injury-causing conduct. 109 S.Ct. at 1206. The identified deficiency must be closely related to the ultimate injury. *Id; see Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989) (specify what city failed to do that evidences deliberate indifference). However,

"in the usual case, factual allegations of a failure to train would support an inference that failure to act in accordance with proper training in that area was causally connected." *Santiago v. Fenton,* 891 F.2d 373, 382 (1st Cir.1989). As such, Cooper's claim that the officers receive inadequate training in pursuit of felons and the use of deadly force and the use of such a pursuit and force in connection with the apprehension of Cooper would be connected by reasonable inference. *See id.* Therefore, to support a claim of municipal liability based upon a failure to train, a plaintiff must show: 1) inadequate training, 2) the inadequate training represents a policy which reflects a deliberate indifference to plaintiff's constitutional rights, and 3) the policy caused the alleged violation of constitutional rights. *Harris,* 109 S.Ct. at 1205–07.

 In support of the deliberate indifference standard, plaintiff relies on, for example, the following deposition testimony of Officer Magaw:

Q. Has there ever been any discussion with the police chief or with other officers regarding when it is appropriate to use deadly force?

A. It would be the same circumstance as a high-speed chase. There's been discussion, but never any general rules or anything.

Q. Well, you mentioned with regards to the high speed chase that you were told to ... You said to be safe. What were you told regarding a high-speed chase?

A. Just, you know, make sure you don't get hurt.

Q. That's as far as you know the only instructions you've ever been given regarding a high-speed chase?

A. I didn't take it as instructions. It took it more or less as don't get yourself hurt.

\* \* \* \* \* \*

Q. What was that [deadly force policy]?

A. It was that we would be permitted to use deadly force if we felt our life had been threatened, that someone else's life had been threatened or that our lives, my

life or somebody else's was imminently going to be threatened.

Magaw Deposition at 11, 13. Moreover, Magaw testified that there was no policy regarding any shooting during a chase and that he received no training at the police academy regarding shooting during high speed pursuits. Magaw Deposition at 68. Cooper thus concludes that there was no policy or training or that if one existed at all, it was barely adequate.

Trainer disagrees, arguing that when a robbery is reported with a fleeing suspect, possibly armed and dangerous, Pennsylvania statutes regarding pursuits and the use of force are automatically triggered regardless of local procedures. At the same time, Trainer concedes that there was no oral or written policy or procedure dealing with the actual use of deadly force or vehicular pursuit beyond the automatic triggering of the statute and that for this state of affairs, the policy makers could probably use a "mental health check-up." Defendants' Motion for Summary Judgment at 15.

In light of the duties assigned to police officers, the need for training regarding police pursuits and the constitutional limits on the use of deadly force to arrest fleeing felons is patently obvious. *See Harris*, 109 S.Ct. at 1205, n. 10. In *Canton*, the city had a written policy, itself constitutional, regarding medical treatment for detainees, and the city argued that it was not obvious that its training program was insufficient to administer its policy. *Id.* 109 S.Ct. at 1204–05 & n. 11. Unlike the situation in *Canton*, there is little evidence of any efforts on Trainer's part to train officers to administer the statutes. The failure to train officers beyond the usual admonition at roll call to "be careful out there" "could properly be characterized as 'deliberate indifference.'" *Id.; Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989). This case is analogous to the Supreme Court's example in *Harris* of when a failure to train evidences deliberate indifference. If proven at trial, Trainer's apparent failure to train its officers, could be found to represent a city policy and could result in a finding of a violation of Cooper's constitutional rights

to be free from the unreasonable use of force.

There is a genuine dispute between the parties regarding the existence of any adequate training. Magaw testified that Trainer's officers participated in a number of pursuits but there was no policy, procedure or training regarding such situations. Trainer continues to maintain that its policy was to follow the Pennsylvania force statute, and apparently argues that this constitutes proper training. However, Trainer offers no evidence of any training to administer the policy. In any case, the Court cannot conclude as a matter of law, as Trainer argues, that the decision to use the statutes as a policy evidences proper and adequate training. There is no evidence that the Borough provided any practical training either in the field or in the form of a manual or procedure to guide its officers. *See generally Canton*, 109 S.Ct. at 1205 n. 12; *Holman v. Walls*, No. 86–1–JRR (D.Del. June 13, 1989), slip op. at 9 (evidence of adequate training in the limits on the use of deadly force includes training at state police academy on the use of deadly force, education by the police department, films on the use of deadly force, and training lectures).

The Court therefore concludes that summary judgment is not appropriate. Cooper has presented sufficient evidence to create a genuine, triable issue of fact regarding the state of training of the officers and whether Trainer had a policy of inadequately training its officers to handle situations such as the one presented here. For the reasons stated above, Trainer's motion for summary judgment will be denied.

### B. *State Law Claims*

In Count XXII of the Complaint, plaintiff raises state law claims against the Borough of Trainer based on its responsibility for Magaw's actions as well as its lack of policy or training with respect to the use of deadly force or the conduct of a pursuit. Aside from the claim based on responsibility for Magaw's actions, the allegations mir-

ror exactly those asserted in Count XX, the federal cause of action.

Trainer asserts that it is immune from liability based upon the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541 et seq., (Purdon 1987) (hereinafter "Act"). Section 8541, the general immunity provision, states that "except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury ... caused by any act of the local agency or an employee thereof or any other person." Under the terms of the Act, Trainer is entitled to immunity unless Cooper can show that Trainer's conduct falls within exceptions to immunity provided by the Act.

Section 8542(b)(1)–(8) provides eight specific exceptions to the general grant of immunity. In order to fall within one of the exceptions, however, two conditions must be met. First, the damages sought must be recoverable pursuant to common or statutory law, under circumstances that would not otherwise admit to any immunity defense. 42 Pa.C.S.A. § 8542(a)(1). Second, negligence must be the basis of the complained of conduct. 42 Pa.C.S.A. § 8542(a)(2). Specifically, a plaintiff may recover against a political subdivision for negligent conduct by the local agency or its employee arising out of the operation of a motor vehicle, the care of real property, dangerous conditions created by trees, traffic control and street lighting, utility service facilities, improper street and sidewalk maintenance and the care of animals. In addition, the exceptions are to be narrowly construed. *Laney v. City of Pittsburgh*, 663 F.Supp. 1097, 1099 (W.D.Pa.1987).

The complaint alleges that Magaw acted negligently, unlawfully and intentionally. It appears that plaintiff attempts to invoke the exception in § 8550 which discards immunity held by *employees* for willful misconduct. This section is no aid to plaintiff. Each of the waived immunities exposes employees to personal liability without dissolving the shield of immunity held by the municipality. *See Buskirk v. Seiple*, 560 F.Supp. 247, 252 (E.D.Pa.1983). The general municipal immunity is retained

for the political subdivisions except for these eight areas of negligent conduct. *Id.; see also Hampel v. Daily*, No. 89–7447, 1989 WL 153932 (E.D.Pa. December 15, 1989) (granting motion to dismiss plaintiff's state law claim against Chester Township for "intentionally implementing a policy of inadequate policy training").

Trainer's own actions do not fall into any of the eight exceptions to immunity. The state claims are based primarily on respondeat superior and negligence theories and Trainer's possible exposure to liability would involve any injury caused by a negligent act of an employee acting within the scope of his employment regarding the operation of an automobile. 42 Pa.C.S.A. § 8542(b)(1). This exception has been applied generally in situations involving car accidents involving municipal owned vehicles. Negligence claims however, are "inconsistent and incompatible" with civil rights claims. *Sambrick v. Borough of Norristown*, 639 F.Supp. 1351, 1356 (E.D. Pa.1986) (no federal jurisdiction over state law claims against borough based on respondeat superior theory). The *Sambrick* court held that allowing plaintiffs to proceed against a municipality on a respondeat superior theory under the Fourteenth Amendment would frustrate Congress' intent regarding the civil rights enforcement scheme which prohibits federal litigation of vicarious liability claims against municipalities. *Id.* In the same way, allowing Cooper to litigate this state law negligence claim against Trainer would achieve the same result. *See id.* at 1357 n. 5.

Given the narrow construction of the exceptions to immunity, the fact that state law negligence claims are incompatible with civil rights claim, coupled with the lack of any evidence on the record of any negligent injury-causing actions regarding the *actual operation of a vehicle*, the Court concludes that summary judgment will be granted regarding the pendent state law claims.

## V. CONCLUSION

It is clear that although the Court believes that a factfinder may have little diffi-

culty crediting one party's version over the other's, on an application for summary judgment, the Court must scrupulously avoid resolving any factual disputes. Cooper's success at trial hinges upon a factfinder crediting his account of the chase and if his account is not credited and the accounts of the officers are credited, Cooper will fail. With that in mind, the Court concludes as follows:

1. Officer Merrill's Motion for Summary Judgment on the § 1983 claims based on violations of the Fourth and Fourteenth Amendments is denied.

2. Officer Merrill's Motion for Summary Judgment on the state law claims is denied.

3. Officer Merrill's Motion for Summary Judgment as it pertains to Fifth or Eighth amendment claims is granted.

4. Consistent with plaintiff's representation that he will no longer pursue his claims against the City of Wilmington, Officer Thomas Monahan, and Detective John Hartnett, those claims will be dismissed.

5. Officer Magaw's Motion for Summary Judgment on the § 1983 claims is granted.

6. The pendent state law claims asserted against Officer Magaw are dismissed.

7. Trainer, Pennsylvania's Motion for Summary Judgment on the § 1983 claims is denied.

8. Trainer, Pennsylvania's Motion for Summary Judgment on the state law claims is granted.

An appropriate Order will be entered.